**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Robert HENNIGAN, Appellant.**

Superior Court of Pennsylvania.

Submitted Aug. 9, 1999.
Filed May 9, 2000.

Richard E. Johnson, Philadelphia, for appellant.

Catherine Marshall, Asst. Dist. Atty., Philadelphia, for Com., appellee.

Before McEWEN, President Judge, and LALLY–GREEN and OLSZEWSKI, JJ.

LALLY–GREEN, J.:

¶ 1 Appellant Robert Hennigan appeals from the judgment of sentence dated October 8, 1998. Appellant was convicted of possession of a controlled substance with intent to deliver, criminal conspiracy, and firearms not to be carried without a license. We vacate the firearms conviction, affirm the remaining convictions, and remand for resentencing.

I.

¶ 2 The record reveals that on February 25, 1998, Philadelphia Police Officer Myra Jones of the Narcotics Field Unit drove to 4148 Westminster Avenue in an attempt to purchase drugs. N.T. Trial, 10/7/98, at 11. While she was in the house, Officer Jones gave a pre-marked $10 bill to co-defendant James Williams in exchange for two packets of crack cocaine. *Id.* at 16, 18.[1] Officer Jones left the apartment and immediately notified Officer Calvin Rayfield of the sale. *Id.* at 20.

¶ 3 Officer Rayfield encountered Mr. Williams on the first floor of the house. *Id.* at 145. Officer Rayfield found 30 packets of crack cocaine and one packet of marijuana on Mr. Williams' person. *Id.* at 146, 149. A female who was in the same room as Mr. Williams was released without being charged. *Id.* at 163.

¶ 4 Officer Palmer pursued someone who was fleeing to the second floor. *Id.* at 52. Officer Palmer then proceeded to the rear bedroom, where he saw two men and

---

**1.** Officer Jones also saw an unidentified man, who was not Appellant, in the house. *Id.* at 13, 21.

one woman fall backward out of an open window. *Id.* at 52, 54. The woman, co-defendant Monique Travers, threw a purse onto the floor before falling out of the window. *Id.* at 55–57. Officer Palmer found one hundred clear packets of crack cocaine, but no smoking paraphernalia, in the open purse. *Id.* at 57, 61.

¶ 5 Officer Louis Cujdik was assigned to guard the rear of the house. *Id.* at 85. He saw the second-floor rear window break, and then saw three people fall out the window and land on a pile of rubbish. *Id.* at 86–87. Two of the three were Ms. Travers and Appellant. *Id.* at 88.[2] Officer Cujdik found cash and a set of keys on Appellant's person. *Id.* at 88–89. Officer Cujdik then brought Appellant to the front of the house, and gave the cash to Officer Rayfield. *Id.* at 92. Officer Rayfield testified that he received the pre-marked $10 bill as well as $299 in cash from Officer Cujdik. *Id.* at 154–155, 172, 191.[3] Officer Rayfield clearly remembered finding the marked bill in the property recovered from Appellant at the scene. *Id.* at 193. He then placed the money in an evidence bag. *Id.* at 191.

¶ 6 The marked ten dollar bill was not preserved as evidence in the case. *Id.* at 104. At trial, the Commonwealth presented a copy of the $10 bill, but not the original. *Id.* at 148. Officer Rayfield explained that the bill went back into the Narcotics Unit's "buy fund," and was used in another drug operation. *Id.* at 156.[4] Property receipt 2122980, listing property received from Appellant, did not list the marked bill because "pre-recorded buy money goes back into our fund." *Id.* at 157–158; *see also id.* at 173 (it is not normal police procedure to put marked money on the property receipt, because the money belongs to the buy fund). Officer Rayfield wrote in an investigative report that Appellant was found with $299 in cash plus the pre-marked bill. *Id.* at 191. In another section of the report, however, Officer Rayfield wrote that the marked bill was recovered from Mr. Williams. *Id.* at 178. Officer Rayfield explained at trial that the latter entry "is just a simple typo." *Id.* at 193.

¶ 7 At the scene, Appellant told the officers that the car keys that Officer Cujdik had taken from Appellant fit his 1985 Buick Park Avenue that was parked across the street. *Id.* at 90. Officer Cujdik did not see Appellant operating the car, and did not know how long it had been since the car was last driven. *Id.* at 100. Officer Cujdik testified that he took the automobile to the police station for safekeeping because Appellant did not live in the area. *Id.* at 97–98. Officer Cujdik conducted an inventory search, and found a loaded .380 caliber handgun under a pile of clothes in the back seat. *Id.* at 90.

¶ 8 Before trial, Appellant moved to suppress the gun found during the inventory search. At the suppression hearing, Officer Cujdik was asked whether it is standard procedure "to remove cars from the front of homes when individuals who are charged with drug activity are arrested inside of homes." N.T. Suppression, 10/6/98, at 90–91. Officer Cujdik responded, "If we can ascertain that they own a vehicle, we would take it back with us. Yes." *Id.* at 91. Occasionally, Officer Cujdik commented, officers remove the arrestee's vehicle even when he is arrested from his own house. *Id.* Officer Cujdik further

---

2. The third person who fell from the window was Willie Bullock, who was not charged in this case. *Id.* at 91–92. After all three people who fell from the window were secured, Officer Fernandez found $164 in cash scattered on the ground behind the house. *Id.* at 108.

3. The $299 in cash comprised seven $20 bills, six $10 bills, 11 $5 bills, and 44 $1 bills. *Id.* at 158.

4. Similarly, Officer Cujdik testified that "it could still be in our buy money fund. It could have been used and lost.... We normally don't preserve it. It's used over and over again until it's lost probably." *Id.* at 104.

testified that in this case, the car was impounded for safekeeping because "the house that we had the search warrant for was almost abandoned" and because Appellant stated that he did not live in the area. *Id.* At a preliminary hearing, Officer Rayfield testified that Appellant's vehicle was impounded because Appellant had the keys and registration for it. *Id.* at 101.

¶ 9 The suppression court denied Appellant's motion to suppress without producing formal findings of fact or conclusions of law. The court did state the following on the record:

> As to the keys, I think certainly the officers taking the car for safekeeping, since the defendant didn't live in that area, would certainly be a smart thing to do. As I have indicated, I know the area. I'll take judicial notice of the area of 41st and Westminster being a very low income area, and, of course, the allegations there's drug trafficking there, and especially that would not be a place that you would want to leave your car for safekeeping. Whether the individual said they wanted to move it or not would be of no moment, plus the District Attorney's citation from the Motor Vehicle Code seems to indicate that the police are required to take the car into safekeeping.
>
> For all of those reasons and for the other reasons that are of record, the motion to suppress is denied.

*Id.* at 115–116; *see also id.* at 103 ("This Court is familiar with the area of 41st and Westminster. It's certainly not a place that you would want to leave a car unless you had some kind of access to it on a regular basis.").

¶ 10 At trial, Appellant presented the following defense: he went to the house to visit a friend; he did not know that drugs were being sold in the house; he did not buy or sell drugs; and, he never had possession of the pre-marked bill. N.T. Trial, 10/7/98, at 214–215, 217–218. After he heard "commotion" downstairs, Appellant ran away but said he did not know the reason he was running. *Id.* at 216. He had $299 in cash from a tax refund on his person. *Id.* at 218. Appellant admitted that he did not have a license for the gun in his car, but·he explained that he was holding the gun for a friend. *Id.* at 222.

¶ 11 During closing arguments, Appellant's counsel argued that it was highly unlikely that Appellant received the marked bill from Mr. Williams in the five minute span between Officer Jones' drug buy and the time the police entered the house, particularly because Mr. Williams was found on the first floor and Appellant was first seen on the second floor. N.T. Trial, 10/8/98, at 21. In addition, he argued that the critical piece of evidence linking Appellant to the crime, the $10 bill, was not listed or mentioned on Appellant's property receipt. *Id.* at 25. He argued that Officer Rayfield did not commit a "typo" when he reported that the pre-marked $10 bill was found on Mr. Williams. *Id.* at 28. Rather, counsel argued, the police falsified the section of the report which indicated that the bill was found on Appellant:

> Police Officer Rayfield, being an experienced police officer, had a suspicion. Any of us would. It's natural. Somebody is in a drug house. There's a bust. He's got cash on him, and he's got keys to a car where there's a gun, so there is a suspicion. I don't criticize him for that. But, ladies and gentlemen of the jury, you know what happened. His thinking is, "you know, this guy, he's got to be part of it. He's got to be in on this. I've been in the business a long time." He takes the ten dollars from this pile. Real simple, folks, you just move it right over here and you write up the report that way. I submit that's what happened here....

That ten dollar bill was never taken from my client, and the Commonwealth's own evidence shows that it wasn't. Human nature being what it is, for good, solid police officers who have

an idea, a suspicion, they make mistakes. We know they make mistakes, and sometimes they will do something—Maybe they even fool themselves. Maybe it's a subconscious thing. I don't know.

*Id.* at 28–30.

¶ 12 In response, Assistant District Attorney Andrew Kline argued that Appellant was in charge of handling the money for drug sales taking place in the house. *Id.* at 82–83. The prosecutor noted that Appellant had an unusually large number of small-denomination bills, and was the only person with money in the house. *Id.* The prosecutor also argued that Appellant's counsel improperly focused on Officer Rayfield's typographical error:

And against all of [the evidence against Appellant], ladies and gentlemen of the jury, [Appellant's counsel] says that the mistake was one word in a case with 20–some odd exhibits, with many, many pages of documents, with physical evidence, with testimonial evidence. Does he point to what Officer Cujdik said? What Officer Rayfield said? He doesn't point to that. He points to one word in a case with all of this evidence. One word. And [Appellant's counsel] stood before you and said, "I want you to look at the evidence in this case. I'm not going to try to distract you from the evidence in this case."

Ladies and gentlemen of the jury, looking at one word in the police documents is a Philly Phanatic dancing on that dug-out.

*Id.* at 89. Next, the prosecutor stated that the police officers in this case would not ruin their reputations by lying on the stand in order to convict Appellant. *Id.* at 89–90. Finally, the prosecutor implied that Appellant, rather than the police officers, had a motive to lie in this case. *Id.* at 91.

¶ 13 As noted above, the jury convicted Appellant of possession of a controlled substance with intent to deliver, criminal con-

spiracy, and firearms not to be carried without a license. *Id.* at 154–155. Appellant was sentenced to 5 to 10 years for possession with intent to deliver, 1 to 2 years for conspiracy, and 7 years probation for carrying a firearm without a license. This appeal followed.

## II.

¶ 14 Appellant raises four issues on appeal:

I. Was the evidence insufficient to support the charge of criminal conspiracy insofar as the Commonwealth failed to present any evidence to establish that Appellant entered into a corrupt confederation with any individual or agreed to commit a crime with another individual?

II. Was the evidence insufficient to support the charge of possession of a controlled substance with intent to deliver insofar as there was no evidence presented that indicated either that the Appellant himself committed this crime or that he conspired with or was an accomplice of any individual who may have committed this crime?

III. Did the suppression court err in failing to suppress the gun found in the Appellant's vehicle?

IV. Did the trial court err in overruling an objection to certain comments made by the prosecutor during his closing speech wherein he called the Appellant and his witnesses liars, impermissibly vouched for the credibility of his own witnesses and denigrated trial counsel's defense strategy?

Appellant's Brief at 4.

## III.

¶ 15 First, Appellant argues that the evidence was insufficient to support his conviction for conspiracy. Our standard of review is well-settled.

"The standard we apply in reviewing the sufficiency of evidence is whether, viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the factfinder to find every element of the crime beyond a reasonable doubt." *Commonwealth v. Heberling*, 451 Pa.Super. 119, 678 A.2d 794, 795 (Pa.Super.1996) (citing *Commonwealth v. Williams*, 539 Pa. 61, 650 A.2d 420 (1994)). In applying [the above] test, we may not weigh the evidence and substitute our judgment for that of the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. *Commonwealth v. Cassidy*, 447 Pa.Super. 192, 668 A.2d 1143, 1144 (Pa.Super.1995) (citations omitted). The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence. *Commonwealth v. Valette*, 531 Pa. 384, 388, 613 A.2d 548, 549 (1992) (citations and quotation marks omitted).

*Commonwealth v. Vetrini*, 734 A.2d 404, 406–407 (Pa.Super.1999).

¶ 16 "To sustain a conviction for criminal conspiracy, the Commonwealth must establish that the defendant (1) entered into an agreement to commit or aid in an unlawful act with another person or persons, (2) with a shared criminal intent and (3) an overt act was done in furtherance of the conspiracy." *Commonwealth v. Rios*, 546 Pa. 271, 283, 684 A.2d 1025, 1030 (1996), *cert. denied*, 520 U.S. 1231, 117 S.Ct. 1825, 137 L.Ed.2d 1032 (1997), citing 18 Pa.C.S.A. § 903.[5] "This overt act need not be committed by the defendant; it need only be committed by a co-conspirator." *Commonwealth v. Johnson*, 719 A.2d 778, 784 (Pa.Super.1998) (*en banc*), *appeal denied*, 559 Pa. 689, 739 A.2d 1056 (1999).

¶ 17 Proof of a conspiracy is almost always extracted from circumstantial evidence. *Commonwealth v. Swerdlow*, 431 Pa.Super. 453, 636 A.2d 1173, 1176 (1994). The Commonwealth may present a "web of evidence" linking the defendant to the conspiracy beyond a reasonable doubt. *Johnson*, 719 A.2d at 785. The evidence must, however, "rise above mere suspicion or possibility of guilty collusion." *Swerdlow*, 636 A.2d at 1177 (citation omitted). Mere association, presence at the scene, or knowledge of the crime is insufficient; the Commonwealth must prove that the defendant "became an active participant in the criminal enterprise and that he had knowledge of the conspiratorial agreement." *Id.* (citation omitted).

5. Conspiracy is defined, in relevant part, as follows:

(a) **Definition of conspiracy.**—A person is guilty of conspiracy with another person or persons to commit a crime if with the intent of promoting or facilitating its commission he:

(1) agrees with such other person or persons that they or one or more of them will engage in conduct which constitutes such crime or an attempt or solicitation to commit such crime; or

(2) agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime....

(e) **Overt Act.**—No person may be convicted of conspiracy to commit a crime unless an overt act in pursuance of such conspiracy is alleged and proved to have been done by him or by a person with whom he conspired.

18 Pa.C.S.A. § 903.

¶ 18 When viewed in the light most favorable to the Commonwealth as the verdict-winner, the evidence was sufficient to establish the elements of conspiracy. Mere minutes after Mr. Williams sold crack cocaine to an undercover officer, Appellant was found fleeing from the house with a large amount of cash and the pre-recorded $10 bill used in the transaction itself. Mr. Williams had packets of cocaine, but no cash, in his possession. On the other hand, Appellant was the only person with cash in his possession. This circumstantial evidence established that Appellant entered into a criminal agreement whereby Mr. Williams would sell cocaine and Appellant would take care of the proceeds. Finally, the overt act requirement is established by Mr. Williams' sale of crack cocaine to Officer Jones. Appellant's first claim fails.

### IV.

¶ 19 Next, Appellant argues that the evidence was insufficient to support his conviction for possession with intent to deliver. In order to establish possession with intent to deliver, the Commonwealth must prove both possession of a controlled substance and the intent to deliver that substance. 35 P.S. § 780–113(a)(30). Here, it is undisputed that Mr. Williams, not Appellant, sold cocaine to the undercover officer. Nevertheless, a person may be found guilty of a criminal offense if he acts as an accomplice. 18 Pa.C.S.A. §§ 306(a), 306(b)(3). An accomplice is someone who, "with the intent of promoting or facilitating the commission of the offense[,] aids or agrees or attempts to aid [another person] in planning or committing" the crime. 18 Pa.C.S.A. § 306(c)(1)(ii). The criminal intent necessary to establish accomplice liability is identical to the criminal intent necessary to establish conspiracy. *Commonwealth v. Hatchin*, 709 A.2d 405, 410 (Pa.Super.1998), *appeal denied*, 556 Pa. 672, 727 A.2d 128 (1998). Finally, "even if [a] conspirator did not act as

a principal in committing the underlying crime, he is still criminally liable for the actions of his co-conspirators taken in furtherance of the conspiracy." *Johnson*, 719 A.2d at 785.

¶ 20 Here, as noted above, the evidence was sufficient to establish that Appellant participated in a conspiracy with Mr. Williams to sell drugs to Officer Jones. Thus, Appellant is legally responsible as an accomplice of Mr. Williams for the underlying crime of possession with intent to deliver. Appellant's second claim fails.

### V.

¶ 21 Next, Appellant argues that the suppression court erred in admitting the gun, which was found in his vehicle after an inventory search. Our standard of review is clear:

> In reviewing an order from a suppression court, we consider the Commonwealth's evidence, and only so much of the defendant's evidence as remains uncontradicted. We accept the suppression court's factual findings which are supported by the evidence and reverse only when the court draws erroneous conclusions from those facts.

*Commonwealth v. Hoopes*, 722 A.2d 172, 175 (Pa.Super.1998) (citation omitted), *appeal denied*, 558 Pa. 629, 737 A.2d 1224 (1999).

### A.

¶ 22 Inventory searches are a well-defined exception to the search warrant requirement. *Colorado v. Bertine*, 479 U.S. 367, 371, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987); *Commonwealth v. Nace*, 524 Pa. 323, 327, 571 A.2d 1389, 1391 (1990), *cert. denied*, 498 U.S. 966, 111 S.Ct. 426, 112 L.Ed.2d 411 (1990). "The purpose of an inventory search is not to uncover criminal evidence. Rather, it is designed to safeguard seized items in order to benefit both the police and the defendant." *Commonwealth v. Woody*, 451 Pa.Super. 324, 679 A.2d 817, 819 (1996).

*See also Commonwealth v. Brandt*, 244 Pa.Super. 154, 366 A.2d 1238, 1241 (1976) (*en banc*). Inventory searches serve one or more of the following purposes: (1) to protect the owner's property while it remains in police custody; (2) to protect the police against claims or disputes over lost or stolen property; (3) to protect the police from potential danger; and (4) to assist the police in determining whether the vehicle was stolen and then abandoned. *See South Dakota v. Opperman*, 428 U.S. 364, 369, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976).

¶ 23 A warrantless inventory search of an automobile is different from a warrantless investigatory search of the same. An inventory search of an automobile is permitted where: (1) the police have lawfully impounded the automobile; and (2) the police have acted in accordance with a reasonable, standard policy of routinely securing and inventorying the contents of the impounded vehicle. *Id.* at 368–372, 96 S.Ct. 3092. A warrantless investigatory search of an automobile requires both a showing of probable cause to search and exigent circumstances. *See Commonwealth v. Luv*, 557 Pa. 570, 735 A.2d 87 (1999); *Commonwealth v. White*, 543 Pa. 45, 669 A.2d 896 (1995).

¶ 24 In determining whether a proper inventory search has occurred, the first inquiry is whether the police have lawfully impounded the automobile, *i.e.*, have lawful custody of the automobile. *Opperman*, 428 U.S. at 368, 96 S.Ct. 3092. The authority of the police to impound vehicles derives from the police's reasonable community care-taking functions. *Id.* Such functions include removing disabled or damaged vehicles from the highway, impounding automobiles which violate parking ordinances (thereby jeopardizing public safety and efficient traffic flow), and protecting the community's safety. *Id.* at 368–369, 376 n. 10, 96 S.Ct. 3092.

¶ 25 The second inquiry is whether the police have conducted a reasonable inventory search. *Id.* at 370, 96 S.Ct. 3092. An inventory search is reasonable if it is conducted pursuant to reasonable standard police procedures and in good faith and not for the sole purpose of investigation. *See Bertine*, 479 U.S. at 374, 107 S.Ct. 738 ("reasonable police regulations relating to inventory procedures of automobiles administered in good faith satisfy the Fourth Amendment, even though courts might as a matter of hindsight be able to devise equally reasonable rules requiring a different procedure"). *Compare Florida v. Wells*, 495 U.S. 1, 4–5, 110 S.Ct. 1632, 109 L.Ed.2d 1 (1990) (where police had no standard procedure with respect to the opening of closed containers found during inventory searches, marijuana found in a closed suitcase was properly suppressed). Said another way, the inventory search must be pursuant to reasonable police procedures, and conducted in good faith and not as a substitute for a warrantless investigatory search.

### B.

¶ 26 Pennsylvania Courts have adopted the principles set forth in *Opperman*. *See Commonwealth v. Scott*, 469 Pa. 258, 267, 365 A.2d 140, 144–145 (1976) (authorizing post-arrest impoundment of vehicle where trial court found that impoundment was essential,[6] where inventory procedure was standard practice after car had been impounded, and where vehicle was in high-crime area with expensive stereo equipment in plain view). In *Brandt*, this Court refined and explained *Opperman* as follows:

> [T]he Commonwealth must show that the search was in fact an inventory search pursuant to the objectives laid down in *Opperman*[.] The hearing judge must be convinced that the police intrusion into the automobile was for the purpose of taking an inventory of the

---

**6.** The Court did not explain why it was essen- tial to impound Scott's car after his arrest.

car and not for the purpose of gathering incriminating evidence. Those facts and circumstances which the hearing judge must consider include the scope of the search, the procedure utilized in the search, whether any items of value were in plain view, the reasons for and nature of the custody, the anticipated length of the custody, and any other facts which the court deems important in its determination. If, after weighing all the facts and circumstances, the court is of the opinion that it was an inventory search of an automobile lawfully in police custody, then any evidence seized as a result of this "reasonable" inventory search is admissible. If, on the other hand, the hearing judge determines that the Commonwealth has not shown that the search was part of the police care-taking function rather than their investigative function, the probable cause-warrant standard must be used for determining reasonableness.

*Brandt*, 366 A.2d at 1242 (citations and footnote omitted).

¶ 27 In Pennsylvania, the first inquiry is also whether the police have lawful custody of the vehicle. *Id.* Post-arrest impoundments of vehicles were upheld in the following situations: (1) in the interests of public safety and efficient movement of traffic;[7] (2) where no one claimed ownership of the automobile;[8] (3) where items of value were observed by the police in plain view and the automobile was located in a high-crime area;[9] and (4) pending the obtaining of a search warrant.[10] On the other hand, where a defendant is stopped on the highway for a summary offense, the police have no statutory authority to impound the defendant's vehicle.[11]

¶ 28 The second inquiry by Pennsylvania Courts is whether the inventory search is a legitimate one. The courts appear to focus on whether the inventory search is, in fact, an investigatory search[12] or is beyond what is necessary to inventory the

---

**7.** *See Woody,* 679 A.2d at 819 (authorizing post-arrest impoundment where no one was available to move the car, which was blocking the street); *Commonwealth v. Martinson,* 368 Pa.Super. 130, 533 A.2d 750, 754 (1987), *appeal dismissed,* 521 Pa. 526, 557 A.2d 340 (1989) (authorizing post-arrest impoundment where both the driver and the passenger were unfit to drive, the ownership of the vehicle was uncertain, and the vehicle would have been stranded on the highway); and *Commonwealth v. Corish,* 296 Pa.Super. 92, 442 A.2d 311, 312–313 (1982) (authorizing post-arrest impoundment where vehicle impeded traffic flow and defendant gave no directions about what he wanted police to do with the vehicle).

**8.** *See Commonwealth v. Smagala,* 383 Pa.Super. 466, 557 A.2d 347, 351 (1989), *appeal denied,* 524 Pa. 619, 571 A.2d 382 (1989) (Police arrested the defendant after finding him with drug paraphernalia in the garage of an absent owner's house and impounded a vehicle which was parked outside the garage on the driveway. The vehicle was not owned by the homeowner and allegedly not owned, although admittedly used by, the defendant. Defendant consented to an inventory search, which yielded a gun for which he had no license. Search upheld as a valid inventory search incident to a lawful arrest.) *But see*

*White,* 543 at 56, 669 A.2d at 902–903, *infra* note 12.

**9.** *See Scott, supra.*

**10.** *See Commonwealth v. Holzer,* 480 Pa. 93, 102–103, 389 A.2d 101, 106 (1978).

**11.** *See Commonwealth v. Germann,* 423 Pa.Super. 393, 621 A.2d 589, 593–594 (1993) (Police stopped the defendant for displaying a fraudulent inspection sticker and then conducted a warrantless search of the vehicle. The Court held that no statutory authority existed to impound the defendant's vehicle pursuant to 75 Pa.C.S.A. § 3352 because defendant was not arrested for an offense that required the officer to take the defendant "before an issuing authority without unnecessary delay.") *See infra,* the discussion of § 3352. Since the impoundment was illegal, no inventory search was authorized and, in any event, no warrantless investigatory search was permitted.

**12.** *See White,* 543 Pa. at 56, 669 A.2d at 902–903 (warrantless search of a vehicle beyond the arrestee's person and immediate vicinity was *not* justified as incident to a lawful arrest without an exigency and was not an inventory search but its purpose was investigatory in nature).

contents of the vehicle.[13]

### C.

¶ 29 We now first address whether the police lawfully impounded Appellant's vehicle in this case. The Commonwealth argues that the police lawfully impounded Appellant's vehicle after his arrest through the authority of 75 Pa.C.S.A. § 3352(c)(3) and *Commonwealth v. Collazo*, 440 Pa.Super. 13, 654 A.2d 1174 (1995).

¶ 30 Section 3352(c) of the Vehicle Code provides:

**(c) Removal to garage or place of safety.** Any police officer may remove or cause to be removed to the place of business of the operator of a wrecker or to a nearby garage or other place of safety any vehicle found upon a highway under any of the following circumstances:

(1) Report has been made that the vehicle has been stolen or taken without the consent of its owner.

(2) The person or persons in charge of the vehicle are physically unable to provide for the custody or removal of the vehicle.

(3) **The person driving or in control of the vehicle is arrested for an alleged offense for which the officer is required by law to take the person arrested before an issuing authority without unnecessary delay.**

(4) The vehicle is in violation of section 3353 (relating to prohibitions in specified places) except for overtime parking.

(5) The vehicle has been abandoned as defined in this title[.]

75 Pa.C.S.A. § 3352(c) (emphasis added).

¶ 31 In *Collazo*, the defendant was found guilty of possession and delivery of a controlled substance in connection with a sale of heroin in a public park. *Collazo*, 654

A.2d at 1175. Police saw Collazo drive to the park in a car, exit the car, meet the buyer, return to the car, open the glove compartment, return to the buyer, and hand him an object in exchange for money. *Id.* Following Collazo's arrest, the police impounded his vehicle. *Id.* Collazo told police that he owned the vehicle, but that it was registered in another person's name. *Id.* When the police could not read the vehicle identification number (VIN), the police searched the car for the registration papers of the owner by looking in the glove compartment and found a packet of heroin with the same label as the heroin that had been sold in the park. *Id.*

¶ 32 The Court ruled that Collazo's claim regarding the legality of the search was waived because he failed to raise it before trial. *Id.* at 1176. Despite this finding of waiver, the issue was addressed on the merits. The Court concluded that the police had conducted a valid inventory search:

It is clear that the vehicle which had been operated by appellant was lawfully seized and impounded by police. Under 75 Pa.C.S. § 3352(c)(3), police could remove to a garage or place of safety any vehicle found after "the person driving or in control of the vehicle is arrested for an alleged offense for which the officer is required by law to take the person arrested before the issuing authority without unnecessary delay." 75 Pa.C.S. § 3352(c)(3). Here, the vehicle had been seized by police after appellant's arrest for selling heroin to the informant. The motive for the subsequent search of the vehicle was solely to identify its owner and not to uncover evidence of crime. The search, therefore, was within the caretaking function of the police, and, as such, was properly conducted without a warrant.

*Id.* at 1177.

¶ 33 *Collazo* is not controlling here because the Court found that the issue had

---

**13.** *See Commonwealth v. Anderl*, 329 Pa.Super. 69, 477 A.2d 1356, 1360 (1984) (officer's warrantless "inventory search" behind the

back seat cushions exceeded police "care-taking functions" and was a search to uncover incriminating evidence).

been waived. Consequently, any discussion of the merits of § 3352(c)(3) was *dicta* in that case. *See Housing Auth. of Chester v. Pennsylvania State Civ. Serv. Comm'n*, 556 Pa. 621, 646, 730 A.2d 935, 949 (1999) (unnecessary alternative constitutional grounds for a court's decision may be deemed *dicta* and disregarded in a future case); *Commonwealth v. Perez*, 698 A.2d 640, 643 (Pa.Super.1997) (*dicta* is not binding as precedent). Also, *Collazo* reveals no analysis of why the police obtained lawful custody of the vehicle under § 3352(c)(3).[14] Thus, the Commonwealth's argument that *Collazo* is controlling is not persuasive, and in any event, *Collazo* can be distinguished in its facts.

¶ 34 The proper interpretation to be given to § 3352(c)(3) appears to be an issue of first impression. As noted above, this subsection authorizes impoundment where "[t]he person driving or in control of the vehicle" is arrested for a certain type of crime. Because Appellant was not driving at the time of his arrest, the question becomes whether he was "in control of the vehicle."

▇▇▇▇ ¶ 35 The phrase "in control of the vehicle" is not defined in the statute; therefore, we look to legislative intent because the Legislature's intention controls. 1 Pa.C.S.A. § 1921. Such intent may be ascertained by considering, *inter alia:* (1) the object to be attained; (2) the mischief to be remedied; and (3) the consequences of a particular interpretation. 1 Pa.C.S.A. § 1921(c). In determining legislative intent, it may be presumed that the Legislature did not intend a result that is absurd, unreasonable, impossible to execute, or unconstitutional. 1 Pa.C.S.A. §§ 1922(1), 1922(3); *Eritano v. Commonwealth*, 547 Pa. 372, 377, 690 A.2d 705, 708 (1997). "Statutes or parts of statutes are *in pari materia* when they relate to the same persons or things or to the same class of persons or things. Statutes *in pari mate-*

*ria* shall be construed together, if possible, as one statute." *Commonwealth v. Brown*, 741 A.2d 726, 733 (Pa.Super.1999) (*en banc*), citing 1 Pa.C.S.A. § 1932.

¶ 36 Section § 3352(c)(3) is one of five subsections listing circumstances whereby police may impound vehicles. Other subsections authorize impoundment where the person in charge of the vehicle is "physically unable to provide for the custody or removal of the vehicle," the "vehicle is in violation of section 3353 (relating to prohibitions in specified places)" or the vehicle is "abandoned." §§ 3352(c)(2), (4) and (5). Each of these subsections appears to deal with a situation where a vehicle is left unattended on a highway because the person in charge of the vehicle can not remove it from the highway or because the vehicle is in violation of the law or abandoned. If such vehicles are left unattended on the highway, there are public safety concerns or traffic control concerns. For example, drivers can swerve to avoid a vehicle that is left unattended on the side of a highway or can slow down to observe the vehicle. Both situations could result in accidents or serious traffic flow problems.

▇▇▇▇ ¶ 37 When § 3352(c)(3) is read *in pari materia* to the other subsections of § 3352, the phrase "control of the vehicle" reasonably means control of a vehicle on a highway where the vehicle poses a possible public safety concern or traffic control concern if left unattended. This interpretation is also consistent with the other condition found in subsection (c)(3) itself, *i.e.,* "driving." If a defendant is driving alone and the police stop him in his car on a highway and arrest him, the presence of the car on a highway usually poses a public safety concern if left there unattended. Thus, when subsection (c)(3) is construed *in pari materia* with the other subparts of this section of the statute, subsection (c)(3) covers situations where a public safety

14. Further, we observe that the automobile in *Collazo* was closely connected to the crime for which defendant was arrested. Therefore, a sufficient nexus to the crime existed such that lawful custody might be established.

concern or traffic hazard exists, and where the arrestee is either "driving" or otherwise in "control" of the vehicle at the time of arrest. When interpreted in this manner, § 3352(c)(3) authorizes police to impound a vehicle in circumstances that involve the community care-taking functions of the police, such as public safety concerns and traffic control concerns, and, thus, comports with constitutional standards for impoundment.[15]

¶ 38 We now examine whether the police lawfully obtained custody of Appellant's vehicle under 75 Pa.C.S.A. § 3352(c)(3) because Appellant's vehicle would have been left unattended in a "high-crime" area. The record reflects the following: Appellant's car was legally parked on a public street that is a "highway" for purposes of the Vehicle Code;[16] Appellant was not driving his vehicle; Appellant was not near his vehicle or otherwise controlling it at the time of his arrest; and Appellant's vehicle was not shown to cause a public safety or traffic control concern. On review of the record, the Commonwealth fails to demonstrate that the police had the statutory authority under 75 Pa.C.S.A. § 3352(c)(3) to impound Appellant's vehicle.

### D.

¶ 39 The issue becomes whether the police had legitimate authority under our precedent lawfully to impound Appellant's vehicle. The trial court found that impoundment was justified because Appellant's vehicle would have otherwise been left unattended in a high-crime area. N.T. Suppression, 10/6/98, at 103, 115–116. In doing so, the court implied that the police properly impounded the vehicle because it would have been exposed to a risk of theft or damage.

¶ 40 We now inquire whether the record supports a conclusion that impoundment was within the community care-taking functions of the police. The record reflects that: Appellant's car was legally parked on a public street; Appellant was not driving his vehicle; Appellant was not near the vehicle at the time of his arrest; Appellant's vehicle was not shown to have a nexus to the crime for which Appellant was being arrested; no items of value were in plain view in the vehicle; and Appellant's vehicle was not shown to cause a public safety concern or traffic control concern. The record fails to demonstrate that impoundment occurred: in the interests of public safety and efficient movement of traffic; where no one claimed ownership of the automobile; where items of value were observed by the police in plain view and the automobile was located in a high-crime area; or pending the obtaining of a search warrant. Since the record fails to demonstrate that a community care-taking function was served by impoundment in this case, the police did not obtain lawful custody of the vehicle when the police impounded it. The esteemed trial court erred when it held otherwise and refused to grant the motion to suppress.

¶ 41 The Commonwealth argues (and the trial court concluded) that impoundment of the vehicle is proper if the vehicle is impounded solely for the protection of Appellant's personal property. While it may be true that an arrestee's vehicle may be exposed to danger if it is left legally parked on the public street in a high-crime area, this concern, standing alone, is inadequate to override the reason-

---

15. Since subsection (c)(3) is interpreted in the context of community care-taking functions, such as public safety concerns and traffic control concerns, the issue of whether mere possession of keys and/or registration information is sufficient to meet the standard of "control" required by this subsection need not be addressed.

16. The term "highway" is defined as "the entire width between the boundary lines or every way publicly maintained when any part thereof is open to the use of the public for purposes of vehicular travel." 75 Pa.C.S.A. § 102.

able expectations of privacy enjoyed by our citizens, defendants and non-defendants alike.[17] Further, the Commonwealth fails to demonstrate how its concern about an individual's legally parked vehicle is reasonably related to a community care-taking function.[18] Thus, where the sole issue is the safety of a defendant's legally parked vehicle pending an arrest, the police do not have the authority to impound said vehicle absent some reasonable nexus to the alleged crime or to a community care-taking responsibility.[19] Here, as concluded above, since the Commonwealth did not demonstrate its authority to impound the vehicle, the learned trial court erred when it refused to grant the motion to suppress.

¶ 42 Finally, assuming the impoundment is lawful, we address whether the inventory search was lawful. The Commonwealth presented no evidence that the inventory search took place pursuant to standard police procedures, other than testimony from a police officer that the impoundment was "routine." N.T. Suppression, 10/6/98, at 90–91. Notably, the trial court made no finding that the inventory search took place pursuant to standard procedures. Since the Commonwealth failed to demonstrate that the inventory search was in accordance with relevant legal standards

articulated above, the learned trial court also erred when it refused to grant the motion to suppress. Appellant's claim has merit.

## VI.

¶ 43 We now turn to Appellant's final argument on appeal. Appellant claims that the trial court erred by overruling objections to the prosecutor's closing argument. According to Appellant, the prosecutor impermissibly called Appellant a liar and denigrated Appellant's trial strategy. Appellant's Brief at 34–38.

■■■■■■ ¶ 44 We begin with Appellant's claim that the prosecutor called Appellant a liar. To preserve an issue on appeal, counsel must call the trial court's attention to the specific alleged error at a time when the error can be corrected. *Commonwealth v. Montalvo*, 434 Pa.Super. 14, 641 A.2d 1176, 1184 (1994). The record reveals that Appellant's trial counsel did not object at any point where the prosecutor even implied that Appellant was a liar. Rather, counsel objected when the prosecutor responded to the defense's implication that the **police** had falsified evidence:

> [District Attorney Kline:] And what evidence have they set forth that shows that these officers, doing the dangerous

**17.** Pennsylvania courts protect the privacy rights of defendants to a greater extent than does the United States Supreme Court. *White*, 543 Pa. at 56, 669 A.2d at 902. A defendant's right of privacy and the purpose of the search warrant requirement are both eroded if the police are permitted to impound vehicles that are lawfully parked on a public street in circumstances such as Appellant's, and to inventory search the same. If we permitted routine inventory searches of such vehicles, we may be unwittingly permitting the inventory search to be a substitute for the investigatory search of vehicles without the safeguards provided by the warrant requirement, *e.g.*, showing of probable cause.

**18.** The Commonwealth argues that routine impoundment would reduce the risk of a lawsuit by the arrestee against the police respecting damage that might occur to the vehicle during the arrestee's absence. This risk could

be addressed by asking the arrestee to consent to the police's impoundment of the vehicle. The procedures for such consent could, of course, be part of the standard procedures used by the police in these situations including, without limitation, a written consent form (or refusal) that the arrestee is asked to execute.

**19.** The record reflects testimony by the police that the area in which the vehicle was parked was a "high-crime" area. The police did not explain, however, what they meant by characterizing the area "high-crime", *e.g.*, drug traffic alone, or violence to persons and personal property, such as vehicles parked on public streets. We do not hold that the police, in all cases, do not possess a legitimate community care-taking function in keeping the street free of violence to persons and property. We hold only that the record fails to demonstrate that such function existed on the facts of this case.

job that we know they've got, got on that stand and told you people lies? What evidence do we have? Let's see. If the police officers were lying, ladies and gentlemen of the jury, do you think—

[Appellant's counsel:] **Objection. There was no argument**—

[The court:] Overruled, counsel. Sit down.

[Appellant's counsel:] **—that the police officers—**

[The court:] Overruled. Sit down.

N.T. Trial, 10/8/98, at 90 (emphasis added). Appellant is not entitled to relief on this claim.

 ¶ 45 Finally, we address Appellant's claim that the prosecutor improperly denigrated counsel's trial strategy. Our Supreme Court has set forth the following rules applicable to this claim:

> Generally, a prosecutor's arguments to the jury are not a basis for the granting of a new trial unless the unavoidable effect of such comments would be to prejudice the jury, forming in their minds fixed bias and hostility towards the accused which would prevent them from properly weighing the evidence and rendering a true verdict. *Commonwealth v. Gorby*, 527 Pa. 98, 112–114, 588 A.2d 902, 909 (1991). Moreover, the prosecution and the defense alike are afforded wide latitude and may employ oratorical flair in arguing to the jury. *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 52–55, 454 A.2d 937, 956–957 (1982). The arguments advanced must, however, be based upon matters in evidence and/or upon any legitimate inferences that may be drawn from the evidence. *Commonwealth v. Chester*, 526 Pa. 578, 597–599, 587 A.2d 1367, 1377 (1991). Finally, any allegedly improper prosecutorial comments must also be examined within the context of the conduct of defense counsel. *Commonwealth v. Morales*, 549 Pa. 400, 423–425, 701 A.2d 516, 528 (1997). If a challenged remark is made in response to the defense's clos-

ing argument, it will generally be deemed fair response and hence permissible comment. *See e.g. Commonwealth v. Williams*, 539 Pa. 61, 76 n. 13, 650 A.2d 420, 428 n. 13 (1994), citing *Commonwealth v. Floyd*, 506 Pa. 85, 484 A.2d 365 (1984).

*Commonwealth v. Abu–Jamal*, 553 Pa. 485, 548–549, 720 A.2d 79, 110 (1998), *cert. denied,* —— U.S. ——, 120 S.Ct. 41, 145 L.Ed.2d 38 (1999). As Appellant recognizes, a new trial is warranted if a prosecutor exceeds permissible bounds of advocacy when commenting on counsel's defense strategy. *See, e.g., Commonwealth v. Raffensberger*, 291 Pa.Super. 193, 435 A.2d 864, 870 (1981) (prosecutor exceeded bounds of advocacy by stating, among other things, that "the defense counsel, I believe, is trying to make a fool out of this jury").

 ¶ 46 In the instant case, the prosecutor argued that the defense improperly urged the jury to look at one piece of evidence (Officer Rayfield's statement that the $10 bill was recovered from Mr. Williams rather than Appellant), rather than the totality of the evidence. N.T. Trial, 10/8/98, at 89. Using a baseball analogy, the prosecutor contended that "looking at one word in the police documents is a Philly Phanatic dancing on that dug-out." *Id.* In other words, one discrepancy should not distract the jury from the totality of the evidence, just as a baseball mascot can distract fans from the game. When viewed as a whole, and in the context of the defense's strategy, we find that the prosecutor did not exceed the bounds of advocacy so as to "prejudice the jury, forming in their minds fixed bias and hostility towards the accused which would prevent them from properly weighing the evidence and rendering a true verdict." *Abu–Jamal*, 553 Pa. at 548, 720 A.2d at 110. Rather, the remark "constitutes an appeal to the jury to use its collective intelligence and logic in assessing all of the evidence." *Commonwealth v. Smith*, 321

Pa.Super. 170, 467 A.2d 1307, 1321 n. 20 (1983). Appellant's final claim fails.

¶ 47 As noted above, we find no error with the convictions for conspiracy and possession with intent to deliver. Because Appellant's firearms conviction must be vacated, and because this disposition may alter the court's sentencing scheme, we remand for a reconsideration of Appellant's sentence. *Commonwealth v. Fisher*, 452 Pa.Super. 564, 682 A.2d 811, 819 (1996), *appeal denied*, 546 Pa. 691, 687 A.2d 376 (1996).

¶ 48 Judgment of sentence affirmed for possession with intent to deliver and for criminal conspiracy. Judgment of sentence vacated for firearms not to be carried without a license. Case remanded for resentencing. Jurisdiction relinquished.

¶ 49 OLSZEWSKI, J., files a Concurring and Dissenting Opinion.

OLSZEWSKI, J., concurring and dissenting:

¶ 1 While the expression of the majority view provides a persuasive analysis and sound rationale, I am obliged to concur and dissent. I disagree that the court below should have suppressed the firearm because, after much reflection, I feel constrained to interpret the statute by its plain meaning. I therefore dissent on that one issue. On the other issues, I concur with the majority.

¶ 2 The Commonwealth argues that the police legally conducted an inventory search on the vehicle. To show that the search was legal, the Commonwealth must prove two things: (1) "the vehicle [was] lawfully in the custody of the police" and (2) "the search was in fact a search conducted for purposes of protection of the owner's property." *Commonwealth v. White*, 543 Pa. 45, 669 A.2d 896, 903 (1995). Both prongs are at issue here.

¶ 3 First, appellant's vehicle was legally in the custody of the police pursuant to section 3352. Section 3352(c)(3) allows the police to remove to a garage any vehicle found on the highway where "[t]he person driving or *in control of the vehicle* is arrested for an alleged offense for which the officer is required by law to take the person arrested before the issuing authority without unnecessary delay." 75 Pa.C.S.A. § 3352(c)(3) (emphasis added). The statute thus requires two things: that the car was on a highway, and that the police arrested the person driving or in control of the vehicle. Appellant does not dispute that his car was on a highway; rather, he claims that his car had to be involved in the crime in order for the police to impound it. But this language is nowhere in the statute. As noted above, the statute requires only that the police arrest the person driving or in control of the vehicle. Therefore, the only issue here is whether appellant was in control of the vehicle. He owned the car, had the keys in his pocket, and drove the car to the scene. Thus he was in control of the vehicle. While I share the majority's philosophical discomfort regarding the broad language of the statute, it is well settled that "philosophy cannot be exalted over the plain meaning of the statute." *See Commonwealth v. Thomas*, 743 A.2d 460, 464 (Pa.Super.1999) (quoting *West v. Commonwealth Dep't of Transp.*, 685 A.2d 649, 651 (Pa.Cmwlth. 1996)). Here, the statute is clear; and when the statute's language "is clear and unambiguous, it must be given effect in accordance with its plain and common meaning." *Id.* (quoting *Commonwealth v. Harner*, 533 Pa. 14, 617 A.2d 702, 705 (1992)). While I would be more comfortable if the legislature wanted the police to only impound cars used in the crime for which they arrested the driver or cars left on the highway after police arrest the driver, the legislature did not say so. Instead, it said clearly that the police could impound a vehicle where they arrested the person in control of that vehicle. Because the language here is unambiguous, I will not speculate as to what the legislature may have or should have intended.

¶ 4 Further, my disposition is entirely consistent with this Court's decision in *Commonwealth v. Collazo*, 440 Pa.Super. 13, 654 A.2d 1174, 1177 (1995). In *Collazo*, a man sold heroin in a park with his car parked nearby and the police, after arresting him, impounded his vehicle. *See id.* While the appellant in *Collazo* did return to his car, apparently for heroin, it is important to note that, when police arrested the appellant, he was some distance from his vehicle, as was the appellant before us. *See id.* at 1175. Moreover, the Court did not rely on the car's involvement in the crime in holding that section 3352 provided the police with the authority to impound the vehicle. *See id.* at 1177. The Court instead relied on the caretaking duties of the police: "the vehicle had been seized by police [pursuant to section 3352] after appellant's arrest for selling heroin to the informant. . . . The search, therefore, was within the caretaking function of the police, and, as such, was properly conducted without a warrant." *Id.* Thus, the case is not so distinguishable as it may appear at first glance. Consequently, while section 3352's validity was not the issue directly before that panel, *Collazo* does guide my analysis, particularly when coupled with the language of the statute itself.

¶ 5 Because the police legally impounded the vehicle, the next question is whether the search was "conducted for the purposes of protection of the owner's property." *White*, 669 A.2d at 903.

"An inventory search is not designed to uncover criminal evidence. Rather, its purpose is to safeguard the seized items in order to benefit both the police and the defendant. . . .

Four goals underlie such searches. First, they protect the defendant's property while he is in custody; second, police are protected against theft claims when defendants are given their property upon release; third, they serve to protect the police from physical harm due to hidden weapons; and fourth, when necessary they ascertain or verify the identity of the defendant. Intrusions into impounded vehicles . . . are reasonable where the purpose is to identify and protect the seized items.

As long as the search is pursuant to the caretaking functions of the police department, the conduct of the police will not be viewed as unreasonable under the Constitution."

*Id.* at 1176–77 (quoting *Commonwealth v. Nace*, 524 Pa. 323, 571 A.2d 1389 (1990)). A search is not an inventory search if it "was conducted as part of a criminal investigation." *White*, 669 A.2d at 903. On cross-examination, Officer Rayfield testified:

Q. Is that your standard procedure, to remove cars from the front of homes when individuals who are charged with drug activity are arrested inside of homes?

A. If we can ascertain that they own a vehicle, we would take it back with us. Yes.

Q. Even if the person lives at that residence, you would take their car back to the station?

A. At times, depending on the circumstances, yes.

Q. What was it that made you think that, in this particular case, there was any need for safekeeping of this car?

A. The house that we had the search warrant for was almost abandoned. I believe it's abandoned now, and your client doesn't live in that area.

N.T. Suppression Hearing, 10/6/98, at 90–91. The court then found that the officers took the car to safeguard it. *See id.* at 92, 115. It appears that the officer searched the vehicle as part of his caretaking duties. Thus, this was a valid inventory search. Therefore, I would hold that the court below correctly admitted the weapon found in appellant's vehicle.

¶ 6 I do not dissent lightly, and I share the majority's fear that, as written, this statute allows the police to impound any

vehicle parked on the street when they arrest its owner. But my inherent unease cannot overcome the statute. I refuse to rewrite the statute because I personally would have written it differently. I am thus constrained to dissent.