J-A17019-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| PETER STEVEN VERWYS, | |
| Appellant | No. 817 EDA 2014 |

Appeal from the Judgment of Sentence February 10, 2014
In the Court of Common Pleas of Monroe County
Criminal Division at No(s): CP-45-CR-0001156-2013

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| PETER STEVEN VERWYS, | |
| Appellant | No. 818 EDA 2014 |

Appeal from the Judgment of Sentence Entered February 10, 2014
In the Court of Common Pleas of Monroe County
Criminal Division at No(s): CP-45-CR-0001154-2013

BEFORE:  GANTMAN, P.J., BENDER, P.J.E., and OTT, J.

MEMORANDUM BY BENDER, P.J.E.:               **FILED JULY 20, 2015**

Appellant, Peter Steven Verwys, appeals from the judgments of sentence entered in two separate cases.  In the case docketed at 817 EDA 2014, Appellant was convicted of terroristic threats and was sentenced to a term of incarceration of 21 days to 1 year.  In the case docketed at 818 EDA

2014, Appellant was convicted of possession of a small amount of marijuana and possession of drug paraphernalia, and was sentenced to a fine of $500 and a term of one year probation, imposed to run consecutively to his term of incarceration.  On appeal, Appellant challenges the court's denial of his pretrial motion to suppress the marijuana and paraphernalia, as well as the sufficiency of the evidence to sustain his terroristic threats conviction.  After careful review, we affirm Appellant's judgment of sentence in the case docketed at 817 EDA 2014 (terroristic threats), and reverse his judgment of sentence in the case docketed at 818 EDA 2014 (possession of marijuana and possession of paraphernalia).

The trial court set forth the factual and procedural history of this case as follows:

> Appellant was driving his vehicle on Route 209 Milford Road near Sellersville Drive, East Stroudsburg, Pennsylvania. Pennsylvania State Police Trooper Mark Puopolo noticed the vehicle had an expired tag and registration sticker. Trooper Puopolo initiated a traffic stop and pulled Appellant's car to the side of the road. After identifying Appellant, Trooper Puopolo discovered that there was an outstanding warrant for his arrest. He called for backup and Troopers Smith and Stanco arrived at the scene to assist him. Appellant was then arrested and placed in the back of the police vehicle to be taken for arraignment on the charges underlying the warrant. N.T. Trial, 12/9/2013, pp. 17-34.
>
> While Appellant was under arrest, Trooper Puopolo went back to Appellant's vehicle to secure two firearms that were in plain view. Trooper Puopolo then conducted an inventory search of Appellant's car and found a small amount of marijuana and a glass pipe in the center consol. At the Suppression Hearing, Trooper Puopolo testified that part of the inventory search was to search for valuable items in the car so the items would not be

- 2 -

stolen while the car is unattended. When Trooper Puopolo told Appellant his car would need to be towed, Appellant told him he would call his girlfriend and have her come and remove the vehicle from the road. Appellant's car was ultimately never towed and the inventory search was conducted prior to dispatching the tow truck. N.T. Trial, 12/9/2013, pp. 17-34; N.T. Preliminary Hearing, 5/8/2013, pp. 5-14.

After Appellant was released from custody, Pennsylvania State Police received a phone call from Appellant's brother, Patrick Verwys ("Verwys"). He told Police that Appellant was sending him text messages saying he intended to kill Trooper Puopolo, who was stationed at the Swiftwater Barracks. Trooper Robert Lombardo told Verwys to forward the text messages to him. The text messages that Verwys sent read[, verbatim]:

i really don't wana live anymore. i feel like shit everyday.

that i just cannot be left alone. he had to keep going. they wana invent shit. im sick to my stomach with the way i get treated. i am a native citizen and they wana fuck me over and over. i try to play by the rules. u took my guns. pot and pipe. i am gonna kill him with a 8000 lb truck. i know what will happen to a crown vic at 100.

no. i will find him. there is doing something wrong and there is inventing it. u wana turn 1 think into another. i wana eliminate a bad apple.

dont waste ure time. the police are there to waste my time. they are very predictable. he is gonna get it. i wasnt smoking and driving. they wana invent stuff i dont seee why i am here. i feel like twice a week i get kicked around by something. i smoke pot to ease my back pain and helps me eat. so he takes 75$ away from me and my pipe. im done.

they dont care about my life. i don't care about his. let me waste some $ on a lawyer. why not.

go to swiftwater. they get off at 3. give him the heads up to go on vacation.

Verwys forwarded the above messages and, based on this information, Pennsylvania State Police Sergeant William Cawley had four troopers guard the Pennsylvania State Police Swiftwater

Barracks ("Barracks") parking lot with assault rifles and shields at approximately 3 pm. For safety reasons, people coming to the station were turned away, and people already there were not allowed to leave and [were] moved to the interior of the Barracks. All troopers that were on patrol were instructed to look for Appellant's vehicle. In addition, state police were prevented from reporting to other incidents during this time because all of its resources were focused on protecting the Barracks and its occupants and on finding Appellant.

State Police contacted Verizon Wireless, Appellant's cell phone service provider, and obtained a ping on his location because of the ongoing emergency. The ping showed that Appellant was not in the area of the Barracks and that he was at his residence. At approximately 4 pm, Sergeant Cawley had the troopers that were guarding the Barracks stand down. N.T. Trial, 12/9/2013, pp. 77, 170.

Sergeant Cawley decided not to immediately apprehend Appellant and wait until the morning because of the location of Appellant's residence, that it was after dark, and that the Barracks had limited manpower. Throughout the night, police continued to ping Appellant's location every 15 to 30 minutes. *Id.* at p. 169.

Troopers regrouped at 7 am the next morning and obtained an arrest warrant for Appellant. Sergeant Cawley, Corporal Cramer, and Corporal Chulock went to Appellant's residence. Corporal Chulock proceeded to the interior of the house and encountered Appellant. Chulock yelled to Appellant and told him to not move and put his hands in the air. Appellant ran into the woods behind the house. For safety reasons, police did not follow Appellant into the woods. Police set up a perimeter around the area and called the SWAT team to start a search. *Id.* at pp. 180-82.

Between approximately 1 to 2 pm, Appellant came out of the woods and surrendered himself to Police.

From reviewing Appellant's phone records, police discovered additional messages sent from Appellant to his brother that were not forwarded on May 5, 2013. At trial, the Verizon Wireless Custodian of Records testified for the Commonwealth. The additional text messages read[, verbatim]:

i am going to kill him. i am so sick of them.

- 4 -

they want someone to make the news. They got it.

there is no nore talking. He escalated this way to far.

a working man with chop saws and plasma cutters of value. they ask me if I have anything valuable in truck. i guess pot is worth his life. they just wana add charges. guess he chose wrong. stay there. You won't. im lookin for him.

i want it written so when they do an investigation maybe the next one might think harder.

dont waste ure time. no money. lawyer. I asked him if he wants to open that can of worms. he chose the path.

since u called them i want all 4 back and i will act like this day never happened. im shutting phone off im outta of here. this jerk off keeps calling me.

i am not gonna stop till i get justice or they give me my shit back.

no. when its home. you may see me. till then im gonna look for them.

im 8 miles awy on a mission.

im not getting tracked.

nope. got get my shit from piggy before i do.

i told the pig he was openeing a can of worms. He made the choice. what did he think i was gonna pay a fine and smile to the judge. these assholes think im stupid. When my shit is back I will calm down noone will ever be harmed.

i smiled and did what i needed to get out. He shouldve did his part. he charged me now its my time. it's very simple. give me my shit back or im gonna waste alot of peoples time.

haha. tell them thats not smart. Tell them if they were smart they would give me my shit back. Its that simple. they dont wana fmd me. i know hes off work and i will find them. lazy pigs are too predictable. i watch out for them too much.

nope. There wasnt much to give them. i took a drive to find him. i am gonna kill him.

no they took my shit. im gonna take one of them. there more scared. they wont find me but they will find them. there the hunted now. I just want my shit back. if i get it back i wont harm a soul. i have no intention to. he opened a book with no end. i just want my shit back. i could care less if i can get them tomorow or not. i want everything back. they want a make a criminal i will even the playong field.

no thanks i eat when i got home and dropped truck. its too easy to find.

On June 11, 2013, two Criminal Informations were filed: 1154 CRIMINAL 2013 and 1156 CRIMINAL 2013.

Case number 1154 CRIMINAL 2013 charged Appellant with Possession of a Small Amount of Marijuana for Personal Use, Possession of Drug Paraphernalia, Driving an Unregistered Vehicle, and Operating a Vehicle Without a Valid Inspection.

Case number 1156 CRIMINAL 2013 charged Appellant with Terroristic Threats with Intent to Terrorize Another.

Appellant was arraigned on June 12, 2013.

On July 12, 2013, Appellant filed omnibus pretrial motions, and a hearing on Appellant's motions was held on August 26, 2013. We denied Appellant's omnibus motions in an Order and Opinion dated October 29, 2013, which we incorporate here.

On December 3, 2013, Appellant filed a ["]Motion in *Limine* to Exclude the Commonwealth's Reference to Appellant Being Arrested on Arrest Warrant["] and an accompanying brief in support of the motion. On December 5, 2013, the Commonwealth filed a ["]Brief in Opposition to Appellant's Motion in *Limine*.["] We orally denied the motion reasoning that referencing the arrest warrant was allowed under *res gestae*.

On December 10, 2013, a jury found Appellant guilty of Terroristic Threats with Intent to Terrorize Another, Possession of Marijuana—Small Amount Personal Use, and Possession of Drug Paraphernalia. The jury also found that the Commonwealth had proven beyond a reasonable doubt that the threat caused the occupants of the building, place of assembly or facility of

public transportation to be diverted from its normal or customary operations, thus making this offense a third degree felony under 18 Pa.C.S. § 2706(d). That same day, Appellant was found guilty after a bench trial of Driving an Unregistered Vehicle and Operating a Vehicle Without a Valid Inspection and sentenced to pay a fine of $100.31.

On February 10, 2014, Appellant was sentenced to a period of incarceration of not less than 21 days['] nor more than 1 year for the Terroristic Threats offense, one year of probation for Possession of Drug Paraphernalia to run consecutive to the sentence for Terroristic Threats, and a $500 fine for Possession of a Small Amount of Marijuana. Appellant was given a 21-day time credit and placed on immediate parole.

On March 11, 2014, Appellant filed a Notice of Appeal to the Pennsylvania Superior Court.[1] Also on March 11, 2014, this Court ordered Appellant to file a Concise Statement of Matters Complained of on Appeal pursuant to Pa.R.A.P. 1925(b) within 21 days of the date of the Order. On April 1, 2014, the Rule 1925(b) statement was filed.

Trial Court Opinion (TCO), 5/21/14, at 2-8 (footnotes omitted).

Herein, Appellant raises three issues for our review:

a. Where a vehicle is immobilized for failing to have a registration but the vehicle poses no threat to public safety, can the vehicle be lawfully impounded and therefore subject to an inventory search?

b. Where the driver of a vehicle is arrested, but the police do not remove or attempt to remove the vehicle and the police have a protocol in place that allows the arrestee to coordinate for the alternative removal of the vehicle, can the vehicle be lawfully inventory searched?

c. Are the text messages sufficient to sustain a conviction for Terroristic Threats where [the] text messages were sent from

_____

[1] Appellant filed separate notices of appeal in each of his two cases. On April 9, 2014, he filed with this Court an application for consolidation, which we granted by order dated April 28, 2014.

one brother to another brother complaining about the first brother's interaction with the state police that particular day, and the messages are later forwarded by the receiving brother to the [s]tate [p]olice?

Appellant's Brief at 7.

Appellant's first two issues challenge the trial court's denial of his pretrial motion to suppress the marijuana and paraphernalia found in his car during the inventory search. We need not address the claims set forth in Appellant's first issue because, for the reasons stated *infra*, we agree with Appellant that the inventory search of his vehicle was illegal based on the argument he presents in his second issue.

Our standard of review for denial of a suppression motion is as follows:

In reviewing an order from a suppression court, we consider the Commonwealth's evidence, and only so much of the defendant's evidence as remains uncontradicted. We accept the suppression court's factual findings which are supported by the evidence and reverse only when the court draws erroneous conclusions from those facts.

*Commonwealth v. Hoopes*, 722 A.2d 172, 174-75 (Pa. Super. 1998).

In examining the validity of the inventory search conducted in this case, we apply the following legal principles:

A warrantless inventory search of an automobile is different from a warrantless investigatory search of the same. An inventory search of an automobile is permitted where: (1) the police have lawfully impounded the automobile; and (2) the police have acted in accordance with a reasonable, standard policy of routinely securing and inventorying the contents of the impounded vehicle. A warrantless investigatory search of an automobile requires both a showing of probable cause to search and exigent circumstances.

- 8 -

In determining whether a proper inventory search has occurred, the first inquiry is whether the police have lawfully impounded the automobile, *i.e.*, have lawful custody of the automobile. The authority of the police to impound vehicles derives from the police's reasonable community care-taking functions. Such functions include removing disabled or damaged vehicles from the highway, impounding automobiles which violate parking ordinances ... and protecting the community's safety.

The second inquiry is whether the police have conducted a reasonable inventory search. An inventory search is reasonable if it is conducted pursuant to reasonable standard police procedures and in good faith and not for the sole purpose of investigation.

*Commonwealth v. Chambers*, 920 A.2d 892, 895 (Pa. Super. 2007)

(quoting *Commonwealth v. Henley*, 909 A.2d 352, 359 (Pa. Super. 2006)

(*en banc*) (citations and quotation omitted)).

In the present case, the trial court concluded that Trooper Puopolo lawfully impounded Appellant's vehicle under 75 Pa.C.S. § 3352(c)(3). That provision of the Motor Vehicle Code (MVC) states:

**(c) Removal to garage or place of safety.--**Any police officer may remove or cause to be removed to the place of business of the operator of a wrecker or to a nearby garage or other place of safety any vehicle found upon a highway under any of the following circumstances:

\*\*\*

(3) The person driving or in control of the vehicle is arrested for an alleged offense for which the officer is required by law to take the person arrested before an issuing authority without unnecessary delay.

75 Pa.C.S. § 3352(c)(3).

- 9 -

Applying section 3352(c)(3) to the facts of this case, the trial court reasoned:

> Here, [Appellant] was arrested pursuant to an outstanding warrant. His car was unregistered. He was driving his car when he was arrested, and he was the only occupant of the car. His car was parked on the side of the highway. Thus, Trooper Puopolo properly could have impounded the car, and the car was in police custody.
>
> Trooper Puopolo testified he intended to have the car towed because [Appellant] was under arrest. He conducted the inventory search prior to [Appellant's] telling him that he wished to call his girlfriend to pick up the car. Thus, the car was properly in police custody and was going to be towed.

Suppression Court Opinion (SCO), 10/29/13, at 7.

Appellant, however, argues that while section 3352(c)(3) may have provided Trooper Puopolo with the *authority* to impound his vehicle, a lawful impoundment (and inventory search) did not occur because Trooper Puopolo did not follow the Pennsylvania State Police (PSP) protocol for handling a vehicle when the driver is arrested. Namely, Trooper Puopolo testified at the preliminary hearing (the transcript of which was entered into evidence at the suppression hearing), that upon the arrest of a driver, the PSP protocol provides an officer with "the option to tow the vehicle." N.T. Preliminary Hearing, 5/8/13, at 9. When later asked "what is the protocol … when it comes to vehicle stops and vehicles that are on the side of the road[,]" Trooper Puopolo responded, "[t]he protocol is to tow the vehicle *unless they* [the driver] *can make alternative arrangements*." *Id.* at 19 (emphasis added). Appellant avers that "[b]y permitting a driver to make alternative

arrangements, the vehicle is not impounded or in the custody of the [PSP]. Rather, as in [**Commonwealth v.**] **Lagenella**, [83 A.3d 94 (Pa. 2013),] it is merely immobilized until the decision is made by the driver and the driver's agent arrives."[2]  Appellant's Brief at 25.

A similar argument was addressed by this Court in **Commonwealth v. Chambers**, 920 A.2d 892 (Pa. Super. 2007).  There, Chambers challenged the validity of an inventory search of his vehicle by arguing that under the police protocol, the officer "was required to determine whether [Chambers] wanted to make towing arrangements personally, thus obviating the need for impounding [his] pick-up truck and conducting an inventory search...." **Id.** at 896.  Chambers' argument was based on his "interpretation of General Order D88.8, pursuant to which [the] [o]fficer … conducted the inventory search." **Id.**  Because the Commonwealth had "properly attached" General Order D88.8 "as an exhibit to the suppression notes of testimony[,]" this Court was able to assess the requirements of that order.  **Id.** at 896 n.3.  Upon doing so, we concluded:

> A plain reading of the General Order at issue reveals that, contrary to [Chambers'] assertion, [the] [o]fficer … was not required to determine whether [Chambers] wished to make reasonable alternate arrangements for the pick-up truck, thus obviating the need for an inventory search.  The General Order explicitly provides that officers are authorized to tow a vehicle if

_____

[2] In **Lagenella**, our Supreme Court held that a police officer is not authorized to conduct a warrantless search of a vehicle where it is merely immobilized and not impounded. **Lagenella**, 83 A.3d at 105-106.

it is illegally parked or obstructing the normal and safe movement of traffic. There is no qualifying provision for this authority. Therefore, contrary to [Chambers'] assertion, [the] [o]fficer … did not disregard the police department's standard inventory search procedures.

*Id.* at 896-897 (footnotes omitted).

Unlike in **Chambers**, here, the only evidence produced by the Commonwealth to establish the policy of the PSP regarding impounding and searching vehicles was the testimony of Trooper Puopolo; the Commonwealth did not provide documentary evidence of any written PSP procedures.[3] While Appellant is correct that Trooper Puopolo testified that "[t]he protocol is to tow the vehicle unless they [the driver] can make alternate arrangements[,]" shortly thereafter, the trooper conflictingly stated, "[i]t is in our regulations to tow the vehicle." N.T. Preliminary Hearing at 19. Based on this record, it is unclear whether the policy of the PSP is to *automatically* tow (and inventory search) a vehicle when the driver is arrested, or to only tow the vehicle if the driver cannot make alternative arrangements for the vehicle's removal. There was also no testimony by Trooper Puopolo that an inventory search is conducted by the PSP regardless

---

[3] We acknowledge that the Commonwealth is not required to present the court with the police department's written policy governing inventory searches. **See Commonwealth v. Gatlos**, 76 A.3d 44, 59 (Pa. Super. 2013).

- 12 -

of whether a vehicle will be towed or removed by an agent of the arrested driver.[4]

Based on this record, we are constrained to conclude that the Commonwealth did not meet its burden of proving that the inventory search was conducted pursuant to reasonable, standard police procedures. **See Chambers**, 920 A.2d at 895; **Commonwealth v. West**, 937 A.2d 516, 526-527 (Pa. Super. 2007) (stating the Commonwealth must prove the legitimacy of the inventory search).[5] Therefore, the court erred by denying

---

[4] In **Chambers**, we noted that the officer "testified that, even if [Chambers] had personally made arrangements for the vehicle to be towed, his department would still require an inventory search for valuables in order to protect the police's integrity." **Chambers**, 920 A.2d at 897 n.6. We also pointed out that Chambers did "not proffer[] any evidence that he would have been able to make alternate arrangements for the pick-up truck." **Id.** To the contrary, here, it is undisputed that Appellant did make alternative arrangements to have his girlfriend remove his vehicle.

[5] We additionally note that this Court has "reject[ed] the notion that police may seize a vehicle merely because they arrest the owner." **West**, 937 A.2d at 527; **Commonwealth v. Hennigan**, 753 A.2d 245, 260 (Pa. Super. 2000) ("[W]here the sole issue is the safety of a defendant's legally parked vehicle pending an arrest, the police do not have the authority to impound said vehicle absent some reasonable nexus to the alleged crime or to a community care-taking responsibility."). In **Hennigan**, we concluded that the authority of police to impound a vehicle under section 3352(c)(3) is invoked "where the vehicle poses a possible public safety concern or traffic control concern if left unattended." **Hennigan**, 753 A.2d at 258. Stated another way, section "3352(c)(3) authorizes police to impound a vehicle in circumstances that involve the community care-taking functions of the police, such as public safety concerns and traffic control concerns…." **Id.** at 259. In this case, Trooper Puopolo testified that Appellant's vehicle was not blocking traffic; it was parked "on the shoulder [of the roadway] over the right fog line." N.T. Preliminary Hearing at 14. Therefore, while Appellant
*(Footnote Continued Next Page)*

- 13 -

Appellant's motion to suppress the marijuana and paraphernalia discovered in his vehicle. Consequently, we reverse his judgment of sentence for possession of a small amount of marijuana and possession of drug paraphernalia.

However, for the following reasons, Appellant's judgment of sentence for terroristic threats must be affirmed, as his challenge to the sufficiency of the evidence to sustain that conviction is meritless. In **Commonwealth v. Koch**, 39 A.3d 996 (Pa. Super. 2011), we stated:

> In reviewing a sufficiency of the evidence claim, we must determine whether the evidence admitted at trial, as well as all reasonable inferences drawn therefrom, when viewed in the light most favorable to the verdict winner, are sufficient to support all elements of the offense. **Commonwealth v. Moreno**, 14 A.3d 133 (Pa. Super. 2011). Additionally, we may not reweigh the evidence or substitute our own judgment for that of the fact finder. **Commonwealth v. Hartzell**, 988 A.2d 141 (Pa. Super. 2009). The evidence may be entirely circumstantial as long as it links the accused to the crime beyond a reasonable doubt. **Moreno, supra** at 136.

**Id.** at 1001.

> Appellant challenges his conviction of terroristic threats.

> The Crimes Code states that terroristic threats exist when a person "communicates, either directly or indirectly, a threat to commit any crime of violence with intent to terrorize another." 18 Pa.C.S.A. § 2706(a)(1). Thus, to obtain a conviction for

*(Footnote Continued)* ————————————

does not raise this specific challenge to the validity of the inventory search, it does not appear that the Commonwealth presented sufficient evidence that Appellant's vehicle posed a public safety or traffic control concern to justify its impoundment under section 3352(c)(3).

making a terroristic threat, the Commonwealth must prove that (1) the defendant made a threat to commit a crime of violence; and (2) such threat was communicated with the intent of terrorizing another or with reckless disregard for the risk of causing terror. **Commonwealth v. Kelley**, 444 Pa. Super. 377, 664 A.2d 123, 127 (1995).

**In re L.A.**, 853 A.2d 388, 391-392 (Pa. Super. 2004). Additionally, "[a] direct communication between the defendant and the victim is not required to establish the crime of terroristic threats." **Id.**

Here, it is clear that Appellant's threats to Trooper Puopolo were indirect, as Appellant transmitted his threatening text messages to his brother, not to the trooper. While Appellant acknowledges that direct communication of a threat is not necessary, he maintains that "in cases where a direct communication was not found to be required, there was a close connection between the person to whom the threat was directed (the listener) and the target of the threat (the non-present party)." Appellant's Brief at 27. Appellant contends that here, there was no close connection between Appellant's brother and Trooper Puopolo to prove that Appellant intended that his brother communicate the threats to the trooper.

In support of this argument, Appellant cites **In re L.A.**, where "the listener was a teacher/counselor working with the shelter that was housing the juvenile," and the target of the threat was the juvenile's caseworker. Appellant's Brief at 27; **see also In re L.A.**, 853 A.2d at 390-391. Appellant argues that "[t]he teacher/counselor … would be expected to communicate the threat to the caseworker[,]" whereas Appellant would not

have reason to expect that the threatening statements he transmitted to his brother would be relayed to Trooper Puopolo.

Appellant also relies on **Kelley**. In that case, Kelley called an attorney whose firm had previously represented him. **Kelley**, 664 A.2d at 127. When a secretary answered the phone and asked if she could take a message for the attorney, Kelley "made a threat to commit a crime of violence" against the attorney and a local judge. **Id.** Kelley's threat was communicated to both the attorney and the judge, and he was ultimately convicted of terroristic threats. On appeal, Kelley contended that his conviction was not supported by sufficient evidence "because there was no direct contact between himself and the victims…." **Id.** at 127. We rejected this argument due to the fact that Kelley had made the threat to the attorney's secretary after she specifically asked to relay a message to the attorney. **Id.** Appellant claims that unlike in **Kelley**, he had no "realistic expectation" that that his brother would deliver his threatening text messages to Trooper Puopolo.

While the connection between Appellant's brother and Trooper Puopolo may not have been as close as those discussed in **In re L.A.** and **Kelly**, we conclude that the evidence was sufficient to prove that Appellant intended that his brother transmit the threats to the trooper. As the trial court noted, Appellant told his brother: "go to swiftwater. they get off at 3. give him the heads up to go on vacation." TCO at 13 (quoting N.T. Trial, 12/9/13, at 153). Based on this message, the trial court reasoned that,

> Appellant explicitly told his brother to communicate the message to the intended recipient – Trooper Puopolo. Appellant's statements were not made between brothers with no expectation the threats would not be communicated to the victim; Appellant told his brother to pass the threats along and give Trooper Puopolo the message, which he did.

*Id.* at 13-14. Additionally, the court noted that Appellant also told his brother, "I want it written so when they do an investigation maybe the next one might think harder." *Id.* at 14 (quoting N.T. Trial at 152). The court concluded that this message "further shows that Appellant did not want the messages to stay between him and his brother. He was, in a way, trying to send a message to the state police that bad things could possibly happen if they interacted with him in the future." *Id.* at 14.

We agree with the trial court's interpretation of Appellant's text messages, and with its conclusion that those messages were sufficient to prove, beyond a reasonable doubt, that Appellant wanted his brother to communicate the threats to Trooper Puopolo.

Appellant additionally contends, however, that his threatening text messages were sent in the "spur of the moment," and that this Court has held that "terroristic threats charges were not meant to apply" in such circumstances. Appellant's Brief at 29. Appellant relies on *Commonwealth v. Anneski*, 525 A.2d 373 (Pa. Super. 1987). There,

> this Court concluded that the jury's finding that the appellant was guilty of making terroristic threats was contrary to the weight of the evidence. In *Anneski,* there was an ongoing dispute between the appellant and her neighbor regarding the rural roadway the appellant's children were required to use to walk to school. The neighbor had complained that the children

- 17 -

impeded her progress when she was driving. Believing that the neighbor's car actually struck a school bag being carried by one of her children one morning, the appellant confronted her neighbor and an argument ensued. The neighbor told the appellant that if the children did not get out of her way, she would run into them again. The appellant replied that if the neighbor ran into her children again, she would get a gun and use it. This Court concluded that while the evidence established an exchange of threats made during a heated argument between neighbors, the circumstances of the exchange suggested that the appellant lacked a settled purpose to terrorize her neighbor.

*In re J.H.*, 797 A.2d 260, 262-263 (Pa. Super. 2002) (citing *Anneski*, 525 A.2d at 376).

Even if we accept Appellant's claim that he sent the messages to his brother "out of anger[,]" Appellant's Brief at 30, this Court has stated that "[b]eing angry does not render a person incapable of forming the intent to terrorize." *In re J.H.*, 797 A.2d at 263 (citing *Commonwealth v. Fenton*, 750 A.2d 863, 865 (Pa. Super. 2000)). Instead, "this Court must consider the totality of the circumstances to determine whether the threat was a result of a heated verbal exchange or confrontation." *Id.*

Here, there was no heated verbal exchange or argument between Appellant and Trooper Puopolo prior to Appellant's threatening messages. Trooper Puopolo testified that during the traffic stop, Appellant was cooperative. N.T. Preliminary Hearing at 24. While the trooper also stated that Appellant "was upset that [the trooper] had seized his marijuana," Trooper Puopolo testified that he believed Appellant "understood … that [the officer] was doing what [he] had to do…." *Id.* at 24. At no point did Trooper Puopolo indicate that Appellant was angry during their interaction,

or that the two men had any heated verbal exchanges. Moreover, Appellant's threats were not made during his interaction with the trooper; rather, Appellant's text messages were sent after the traffic stop. Therefore, the evidence does not support Appellant's claim that the threats were made in the 'spur of the moment.' *See In re B.R.*, 732 A.2d 633 (Pa. Super. 1999) (holding that B.R.'s threat to a teacher could not be construed as 'spur-of-the-moment' where they were "not the product of any heated verbal exchange or confrontation" between B.R. and the teacher, and "[t]here was no conversation at all between [the teacher] and B.R. prior to B.R.'s uprovoked statements"); *In re J.H.*, 797 A.2d at 263 (concluding that J.H.'s threats to his teacher were not 'spur-of-the-moment' where, prior to those threats, "there was no heated verbal exchange or confrontation between J.H. and his teacher").

In sum, Appellant's challenge to the sufficiency of the evidence to sustain his terroristic threats conviction is meritless. Accordingly, we affirm his judgment of sentence for that offense. However, because the trial court erred by denying Appellant's pretrial motion to suppress the evidence underlying his convictions for possession of a small amount of marijuana and possession of drug paraphernalia, we reverse Appellant's judgment of sentence for those crimes.

Judgment of sentence affirmed in the case docketed at 817 EDA 2014. Judgment of sentence reversed in the case docketed at 818 EDA 2014. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/20/2015