J-S52028-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| FLINT ANDREW STATON | |
| Appellant | No. 2085 EDA 2015 |

Appeal from the Judgment of Sentence Entered March 31, 2015
In the Court of Common Pleas of Lehigh County
Criminal Division at Nos: CP-39-CR-0000671-2013; CP-39-CR-0000681-2013

BEFORE:  FORD ELLIOTT, P.J.E., STABILE, and STRASSBURGER,[*] JJ.

MEMORANDUM BY STABILE, J.:                    **FILED OCTOBER 25, 2016**

Appellant, Flint Andrew Staton, appeals from the March 31, 2015 judgment of sentence imposing 18 years and 6 months to 43 years of incarceration for stalking, unlawful possession of a firearm, terroristic threats, harassment, possession of an instrument of crime, and possession of a prohibited offensive weapon.  We affirm.

The trial court summarized the pertinent facts in its Pa.R.A.P. 1925(a) opinion:

> Anne Staton and [Appellant] were married in 2002. During the course of their marriage, Anne suffered from various forms of abuse and, in 2010, she left the marital home in Perkiomenville, Montgomery County, Pennsylvania.  At the time,

_____

[*] Retired Senior Judge assigned to the Superior Court.

Anne was pregnant with their daughter, Evelyn, and she and the couple's 2 year old daughter, Grace, stayed at a women's shelter in Allentown for approximately two weeks. After staying with a family friend, Anne returned to the marital home. In November of 2011, the couple got into a physical fight in front of the children. According to Anne, [Appellant] 'manhandled' her and punched her in the head while she was in the fetal position. Anne went to the police the next day. At the suggestion of police, Anne sought and received a temporary protection from abuse (PFA) order in Montgomery County. Anne again left the home with the children and stayed at her mother's home in Emmaus, Lehigh County, Pennsylvania. Though the couple was still apart in December 2011, they spent Christmas day together. Anne planned to have brunch with [Appellant] and then take the children to her grandfather's house. An argument ensued because [Appellant] wanted to go along with them, but Anne explained she was just taking the children. [Appellant] told Anne if he was not going, then nobody was going, and he took Anne's cell phone and car keys away from her. After brunch, Anne took Evelyn upstairs for a nap, and [Appellant] followed her. Anne got Evelyn to fall asleep, but [Appellant] would not allow Anne to leave the bedroom. [Appellant] forced Anne to bend over the bed, twister her arm up behind her back, took her clothes off, and forced her to have sex with him. [Appellant] pushed Anne's face into the mattress and hooked his finger in her mouth in an attempt to prevent her from screaming. Following this incident, Anne and [Appellant] went back downstairs to open presents with Grace. At some point, [Appellant] grabbed a roll of duct tape and said to Grace, 'wouldn't it be funny if we taped up mommy.'

Several hours went by and [Appellant's] brother, Matt, arrived at his house. Anne relayed to Matt while he was outside that [Appellant] would not allow her to leave the house. Matt gained access to the house and helped Anne get her car keys. Anne and the children exited the home, and got in her car. [Appellant] followed and entered the back seat of Anne's car. Anne exited her car and entered Matt's car. Eventually, Anne was able to get back in her car without [Appellant]. She started to pull away and [Appellant] punched at her driver's side window, causing it to shatter. Anne went to her grandfather's house and called the police.

In January 2012, Anne was living with her mother in Emmaus. She and Grace were in a second story bedroom watching TV when they observed what appeared to be a cell phone attached to a pole slowly pan across the window. At the time, a temporary PFA order was in effect preventing [Appellant] from contacting Anne. On February 15, 2012, Anne received an envelope in her mailbox, which contained three Walmart gift cards. The envelope had Anne's name and address written on it, but did not have a stamp on it. Anne recognized the handwriting as Appellant's. On March 20, 2012, a final PFA order was entered in Montgomery County prohibiting [Appellant] from any verbal or physical contact with Anne. [Appellant] was permitted to contact Anne in writing regarding the children only, but he consistently texted and emailed Anne regarding personal matters. Based on statements made by [Appellant] in some of the messages, it appeared as though he knew various places Anne had visited.

[Appellant] continued to contact Anne, despite the PFA, and based on some of his actions, Anne sought and received a PFA on behalf of her daughter Grace in November 2012. The order prevented [Appellant] from contacting Grace and prevented him from possessing any firearms. Around this same time, Anne was taking classes at Northampton Area Community College. One evening, around 8:30-9:00 p.m., when she finished class and went to her car, Anne saw an "X" drawn on her driver's side window. It appeared to be written with Chap Stick. Anne left and was driving on Route 22 when she realized a car had followed her from the school. She proceeded to Boscov's at the Lehigh Valley Mall and parked. The same car she saw following her on Route 22, a dark sedan, followed her and also parked. She entered the store and within a few minutes, Anne saw [Appellant]. He immediately turned around and walked quickly away. Anne advised a sales associate that she had a PFA order against a person that just followed her into the store. Security was alerted, and subsequently the police were called. Anne viewed video surveillance footage and saw [Appellant] enter the store soon after she entered.

[Appellant] continued to text and email Anne for the next few months. On January 31, 2013, sometime between 5:00-6:00 a.m., Anne left her apartment to go to work, and she observed a dark sedan following her. Anne made several turns until she was perpendicular with the vehicle, and she observed

[Appellant] driving the vehicle. [Appellant] was wearing a baseball cap and glasses. Anne called 911 and reported what was happening. Anne was directed by dispatch to drive to the police station, where she was met by Sergeant Timothy Hoats. No vehicles followed Anne to the police station. Hoats advised Anne to stagger her route to work in the future. Subsequently, [Appellant] was charged with stalking and an arrest warrant was issued.

The next morning, February 1, 2013, Sergeant Hoats parked his vehicle near Anne's apartment at around 4:30 a.m. From his vantage point, he could see her entranceway and where her car was parked. Hoats observed Anne leave her apartment around 5:10 a.m. and enter her vehicle. She pulled away going east on Main Street and staggered her route as Hoats had suggested. He paralleled her and followed her for approximately ¼ to ½ mile, but did not see anyone following Anne that day.

On the morning of February 4, 2013, Sergeant Hoats again parked his patrol vehicle near Anne's apartment. Around 5:12 a.m., he observed Anne exit her apartment and eventually saw her vehicle pull out onto Main Street, this time heading west. At that time of day, there was virtually no traffic jam on the street, but Hoats saw a dark sedan following behind Anne. The driver of the sedan was a male wearing glasses and a baseball hat. Hoats pulled out behind the vehicle and accelerated to catch up with the car. When he caught up, the driver hit the brakes and made an abrupt right turn onto 3rd Street without signaling. Hoats followed and entered the license plate into his mobile computer. The registration came back to [Appellant]. Hoats was aware of the outstanding arrest warrant, so he radioed for another patrol unit. Officer Bryan Hamscher received Hoats' call. Hoats advised Hamscher that he was following a car with a possible wanted person and that they were heading towards Hamscher's location. Hamscher and Hoats conducted a vehicle stop of [Appellant].

Sergeant Hoats approached the vehicle and spoke with [Appellant]. Hoats advised Appellant of the warrant, and took [Appellant] into custody. Based on the location of [Appellant's] vehicle, it needed to be towed. Pursuant to Emmaus Police Department policy, the vehicle was inventoried before being towed. During the inventory search, Officer Hamscher located a

- 4 -

wallet, a pocketknife, a folding butterfly knife, and stun baton in the center console. Hamscher opened the trunk and found a large kitchen knife in plain view. At this point, Hamscher stopped the inventory search and contacted Hoats. Hoats decided to secure the vehicle and apply for a search warrant.

[Appellant] was transported to the police station and placed in a holding cell. At the station, Sergeant Hoats performed a search of [Appellant] and discovered he was wearing a bulletproof vest. Additionally, Hoats found a balaclava style ski mask and a Samsung cell phone. Officer Kevin Schmidt spoke to [Appellant] in the holding cell and asked him if he was willing to talk to the police; [Appellant] agreed. Schmidt read [Appellant] a **Miranda**[1] rights and waiver form, and [Appellant] signed the form. Schmidt interviewed [Appellant] for approximately three hours.

[Appellant] told Officer Schmidt he was coming from Allentown, but when asked, [Appellant] could not tell Schmidt where in Allentown. He also indicated he was dropping someone named 'Sam' off, but said he did not know Sam's last name. [Appellant] indicated he was randomly driving through Emmaus and did not know he was behind Anne. He also stated he always wears body armor. [Appellant] inquired about his car, and when Schmidt asked if there was something in there that should not be, [Appellant] said he did not know if there was a gun in there.

Police subsequently obtained a search warrant for [Appellant's] vehicle. During the search, police discovered numerous items, including a loaded .40 caliber Walther P990 handgun, rubber gloves, wigs, a camouflage mask, walkie-talkies, a Kevlar military helmet, a shoulder holster, a crowbar, a stun gun, duct tape, nylon cable restraints, binoculars, a planner belonging to Anne Staton, a Valentine's Day card that read 'A Promise For My Wife,' a Motorola Razr flip phone, a Cannon [sic] digital camera, a Dell laptop, brass knuckles, a handcuff key, OC spray, a large machete with a sheath, various knives, and a copy of the PFA order against [Appellant]. There were also several items related to the family seafood business, including some of the knives.

---

1 **Miranda v. Arizona**, 384 U.S. 436 (1966).

Sergeant Hoats also secured search warrants for the cell phones and digital camera. The photographs recovered from the camera depicted Anne's apartment entrance, her license plate, her grandfather's home, her mother's partner's license plate, doors at Northampton Community College, and Anne at different stores and gas stations. Anne was unaware these photos were taken. Phone records showed various threatening texts [sic] messages from [Appellant] to Anne. […]

[Appellant] testified at his trial, and denied the allegations of abuse made by Anne. According to [Appellant], Anne abused him. [Appellant] also contradicted Anne's version of the incident that occurred on Christmas day 2011: he indicated the sexual encounter was consensual; that Anne was free to leave, but refused to leave the house; that Anne indicated she was coming back home for good; and that Anne hit him with her car, causing him to put his hands up, which in turn broke the window. [Appellant] denied following Anne on January 31, 2013, and said he was just driving home through Emmaus from a bar in Allentown when he was pulled over on February 4, 2013. He also indicated that he believed Anne, Sergeant Hoats, and Officer Schmidt set him up that day. [Appellant] testified that Hoats and Schmidt both lied under oath at trial.

Trial Court Opinion, 10/21/15, at 2-8.

The case proceeded to a jury trial on February 25, 2015, at the conclusion of which the jury found Appellant guilty of the aforementioned offenses. The trial court imposed its sentence on March 31, 2015, and Appellant filed a timely post-sentence motion on April 2, 2015. The trial court denied Appellant's post-sentence motions on June 24, 2015. This timely appeal followed.

Appellant asserts that the trial court abused its sentencing discretion in imposing sentences above the aggravated range or at the statutory maximum. Appellant also argues the trial court erred in denying his pretrial

motions to suppress evidence. Finally, Appellant also argues his convictions are contrary to the weight of the evidence. Appellant's Brief at 4-8. We will address these arguments in turn.

To preserve a challenge to the trial court's sentencing discretion, an appellant must include in the appellate brief a Pa.R.A.P. 2119(f) statement explaining why the appeal raises a substantial question that the sentence is in appropriate. 42 Pa.C.S.A. § 9781(b); *Commonwealth v. Harvard*, 64 A.2d 690, 701 (Pa. Super. 2013), *appeal denied*, 77 A.3d 636 (Pa. 2013).

> A substantial question requires a demonstration that the sentence violates either a specific provision of the sentencing scheme set forth in the Sentencing Code or a particular fundamental norm underlying the sentencing process. This Court's inquiry must focus on the reasons for which the appeal is sought, in contrast to the facts underlying the appeal, which are necessary only to decide the appeal on the merits. Whether a substantial question has been raised is determined on a case-by-case basis; the fact that a sentence is within the statutory limits does not mean a substantial question cannot be raised. However, a bald assertion that a sentence is excessive does not by itself raise a substantial question justifying this Court's review of the merits of the underlying claim.

*Id.* Appellant asserts that the trial court relied on matters outside the record and that the court imposed aggravated range sentences based on findings that the guidelines already account for. This Court has held that a trial court's alleged reliance on matters outside the record raises a substantial question. *Commonwealth v. Rhodes*, 990 A.2d 732, 745 (Pa. Super. 2009). An allegation that the trial court enhanced a sentence based on factors accounted for in the guidelines also raises a substantial question.

*Commonwealth v. Goggins*, 748 A.2d 721, 732 (Pa. Super. 2000) (*en banc*), *appeal denied*, 759 A.2d 920 (Pa. 2000). We therefore turn to the merits.

We review a challenge to the trial court's sentencing discretion as follows:

> [T]he proper standard of review when considering whether to affirm the sentencing court's determination is an abuse of discretion. ...[A]n abuse of discretion is more than a mere error of judgment; thus, a sentencing court will not have abused its discretion unless the record discloses that the judgment exercised was manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will. In more expansive terms, our Court recently offered: An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous.

> The rationale behind such broad discretion and the concomitantly deferential standard of appellate review is that the sentencing court is in the best position to determine the proper penalty for a particular offense based upon an evaluation of the individual circumstances before it.

*Commonwealth v. Moury*, 992 A.2d 162, 169–70 (Pa. Super. 2010). Several of Appellant's sentences fall within the top of the aggravated guideline range, and several are above the aggravated guideline range. We may vacate a sentence within the guideline range only if it is "clearly unreasonable." 42 Pa.C.S.A. § 9781(c)(2). We may vacate a sentence that falls outside the guideline range if it is "unreasonable." 42 Pa.C.S.A. § 9781(c)(3).

Section 9781 also governs our review of the record:

**(d) Review of record.--**In reviewing the record the appellate court shall have regard for:

(1) The nature and circumstances of the offense and the history and characteristics of the defendant.

(2) The opportunity of the sentencing court to observe the defendant, including any presentence investigation.

(3) The findings upon which the sentence was based.

(4) The guidelines promulgated by the commission.

42 Pa.C.S.A. § 9781(d).

At Appellant's sentencing hearing, the trial court provided a dozen reasons supporting his decision to sentence Appellant at or above the top of the aggravated guideline range. In summary: 1) Appellant shows no contrition for his offenses; 2) Appellant is a danger to society; 3) Appellant inflicted mental cruelty on the victim; 4) a lesser sentence would not sufficiently protect the victim; 5) Appellant had a prior conviction involving the victim; 6) Appellant's victimization of the victim extended over a period of 2½ to 3 years; 7) Appellant exhibited elevated sophistication in how he committed the offenses; 8) Appellant has an exceptional proclivity for using firearms and other weapons; 9) Appellant blames the victim; 10) Appellant's "undeterrable" persistence in contacting the victim after she obtained protection under the Protection From Abuse Act; 11) Appellant has low potential for rehabilitation; and 12) Appellant's offense had an extreme impact on the victim. N.T. Sentencing, 3/31/15, at 139-41; N.T. Post-Sentence Motion Hearing, 6/24/15, at 19.

Appellant asserts that the record does not support findings that a lesser sentence would not protect the victim; that his persistence in contacting the victim is undeterrable, or that his potential for rehabilitation is very low. We will consider these matters in turn. Concerning the protection of the victim, the record supports the trial court's findings that Appellant's conduct persisted over 2½ to 3 years, that Appellant persistently followed and photographed the victim and her whereabouts, that he had a prior conviction involving her, and that he was heavily armed when police apprehended him, including unlawful possession of firearms, possession of brass knuckles, and possession of a stun baton. Given the persistence of Appellant's unlawful conduct and given the potential threat to the victim arising from Appellant's weaponry, we discern no abuse of discretion in the trial court's decision to impose a lengthy sentence in order to protect the victim.

Next, we consider the trial court's finding that Appellant's persistence in contacting the victim is undeterrable. As the court noted, Appellant's unlawful conduct persisted for several years, including after the victim obtained a PFA against him. At sentencing, Appellant accused the victim of lying under oath about his abusive behavior. N.T. Sentencing, 3/31/15, at 113. Again, the record supports the trial court's findings, and we discern no abuse of sentencing discretion. Finally, we consider Appellant's potential for rehabilitation. In addition to the aforementioned facts, Appellant insinuated

at sentencing that the prosecutor was manipulative and had a personal vendetta against Appellant. *Id.* at 113-14. Given the persistence of Appellant's unlawful conduct, his lack of contrition, and his comments blaming the victim and the prosecutor, the record supports the trial court's finding that Appellant is not amenable to rehabilitation.

Appellant also argues the trial court imposed sentences at or above the aggravated range based solely on the gravity of his offenses. Appellant notes that the sentencing guidelines account for the gravity of each offense. The record fails to support Appellant's argument. As noted above, the trial court provided twelve reasons for imposing a sentence at or above the aggravated guideline range. The trial court did not rely merely on the gravity of the offense, but on the unique facts of this case. Finding no abuse of sentencing discretion, we reject Appellant's first assertion of error.

Next, Appellant argues the trial court erred in denying Appellant's pre-trial motions to suppress evidence.

> Our standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, we are bound by these findings and may reverse only if the court's legal conclusions are erroneous. Where, as here, the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an

- 11 -

appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to our plenary review.

***Commonwealth v. Jones***, 988 A.2d 649, 654 (Pa. 2010).

First, Appellant argues that his wallet, pocketknife, butterfly knife, and stun baton were the fruits of an unlawful vehicle inventory search. Appellant develops no legal argument regarding the inventory search, and we could deem this issue waived on that basis. Pa.R.A.P. 2119(b); ***Commonwealth v. Williams***, 959 A.2d 1252, 1258 (Pa. Super. 2008). Nonetheless, we conclude that the trial court's April 11, 2014 opinion accurately addresses the merits. Trial Court Opinion, 4/11/14, at 12-14.

Next, Appellant challenges the admissibility of inculpatory statements he made to the police. Appellant asserts that he was coerced into talking to police, and that police continued the interview after he asked for an attorney and that the interview continued after he asked for it to stop. The voluntariness of a confession is a question of law, and our review is plenary. ***Commonwealth v. Nester***, 790 A.2d 879, 881 (Pa. 1998). Instantly, the voluntariness of Appellant's statements depended entirely on the trial court's resolution of the conflicting testimony offered by Appellant and Patrolman Kevin Schmidt. Indeed, Appellant's brief concedes that this argument "can only be resolved with a credibility determination between [Appellant] and Officer Schmidt." Appellant's Brief at 27.

The trial court found as follows:

Officer Schmidt credibly testified that he read [Appellant] a *Miranda* rights and waiver form, that [Appellant] agreed to speak with him, and that [Appellant] signed the form. Schmidt stated [Appellant] appeared to understand his rights and did not appear to be under the influence. Schmidt also testified that [Appellant] never asked to stop the interview and did not ask for an attorney. [Appellant] does not deny he signed the *Miranda* waiver form, but rather alleges he did not know what the form was, and felt threatened and coerced into signing it. Specifically, [Appellant] testified Schmidt asked him about dead bodies and about sexual matters involving Anne Staton. [Appellant] also stated he asked for an attorney multiple times. I find [Appellant's] testimony incredible.

Trial Court Opinion, 4/11/14, at 14-15.

Thus, the record contains evidence—Officer Schmidt's testimony—supporting the trial court's findings. As noted above, the standard of review permits our consideration of the Commonwealth's evidence and only so much of Appellant's evidence as is uncontradicted. *Jones*, 988 A.2d at 654. Here, Appellant relies on his own testimony, which the Commonwealth witnesses contradicted and which the trial court deemed not credible. Viewing the evidence in accordance with our standard of review, the record supports the trial court's finding that Appellant made a voluntary statement to the police. The trial court did not err in denying Appellant's motion to suppress his statement.

Next, Appellant argues the trial court should have suppressed items that police seized from his car pursuant to a search warrant. Appellant argues the affidavit of probable cause did not support issuance of the warrant. Appellant's argument depends on the success of his challenges to

the inventory search and to his statement, as the affidavit of probable cause referred to both.  Appellant argues we must analyze the affidavit of probable cause without reference to any unlawfully obtained evidence.  We have found no error in the trial court's refusal to suppress the inventory search or his statement, and therefore have no reason to conclude that the affidavit of probable cause contained tainted evidence.  Appellant's argument lacks merit.[2]

Appellant next argues the trial court erred in denying his motion to suppress data retrieved from a Samsung cell phone, a Motorola cell phone, and a Dell laptop computer because police lacked probable cause to obtain the search warrant.  Appellant also argues the scope of the warrant was overbroad, in that it permitted retrieval of data other than text messages, emails, or phone calls.

The record reveals that the Motorola cell phone and the Dell laptop did not yield any evidence.  We therefore confine our analysis to the Samsung cell phone.

> The legal principles applicable to a review of the sufficiency of probable cause affidavits are well settled.  Before an issuing authority may issue a constitutionally valid search warrant, he or

---

[2] Appellant also argues that the firearm should be suppressed, as there is no evidence he told police that a firearm was in the vehicle.  Appellant recognizes, correctly, that his argument depends on the trial court crediting his testimony over that of Patrolman Schmidt.  As noted above, the trial court credited Patrolman Schmidt's testimony, and we can consider Appellant's evidence only insofar as it is uncontradicted.

she must be furnished with information sufficient to persuade a reasonable person that probable cause exists to conduct a search. The standard for evaluating a search warrant is a totality of the circumstances[.] A magistrate is to make a practical, common sense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. The information offered to establish probable cause must be viewed in a common sense, non-technical manner. Probable cause is based on a finding of the probability, not a prima facie showing of criminal activity, and deference is to be accorded a magistrate's finding of probable cause.

*Commonwealth v. Ryerson*, 817 A.2d 510, 513–14 (Pa. Super. 2003)

(internal citations and quotation marks omitted).

Appellant also relies on *Commonwealth v. Grossman*, 555 A.2d 896

899 (Pa. 1989).

Although some courts have treated overbreadth and ambiguity as distinct defects in warrants, […] both doctrines diagnose symptoms of the same disease: a warrant whose description does not describe as nearly as may be those items for which there is probable cause. Consequently, in any assessment of the validity of the description contained in a warrant, a court must initially determine for what items probable cause existed. The sufficiency of the description must then be measured against those items for which there was probable cause. Any unreasonable discrepancy between the items for which there was probable cause and the description in the warrant requires suppression. An unreasonable discrepancy reveals that the description was not as specific as was reasonably possible.

*Id.* at 899-900.

As is evident from the recitation of facts above, police knew that

Appellant continued to contact the victim via phone call, text message, and

email, even after she obtained a PFA against him. The affidavit of probable cause set forth several of the unwanted messages. Plainly, the police had sufficient probable cause to get a warrant for a cell phone found in Appellant's possession and for which he had the passcode. Appellant argues the warrant was flawed in that it permitted police to search for all user-generated data that may be relevant to the investigation, rather than just emails, text messages, and phone calls. Whatever the merit of Appellant's argument, his brief fails to specify precisely whether police retrieved any evidence from the Samsung cell phone other than emails, text messages, or phone calls. Likewise, Appellant's brief does not address the law governing search warrants for digital information. In **Commonwealth v. Orie**, 88 A.3d 983, 1009 (Pa. Super. 2014), this Court noted that warrants authorizing seizure of all information found in a computer are overbroad, but warrants authorizing seizure of information relevant to the criminal investigation are valid. Indeed, a warrant must provide enough guidance for the executing police officers to distinguish items of evidentiary value from items of no evidentiary value. **See United States v. Wecht**, 619 F.Supp.2d 213, 229 (W.D.Pa. 2009).

In summary, the warrant was limited to data recovered from devices found in Appellant's car among all the other paraphernalia he used in commission of the offenses at issue. Likewise, Appellant acknowledges that the warrant authorizes seizure only of data relevant to the investigation.

Ultimately, Appellant's overbreadth argument is underdeveloped. He argues the warrant should have been limited to email, phone call, and text message data, but he fails to describe whether police seized any other data or why the warrant did not authorize that seizure. We therefore discern no basis upon which to disturb the suppression court's order.

Appellant's final argument is that the jury's verdict is contrary to the weight of the evidence.

> A motion for a new trial based on a claim that the verdict is against the weight of the evidence is addressed to the discretion of the trial court. A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice. It has often been stated that a new trial should be awarded when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail.

> An appellate court's standard of review when presented with a weight of the evidence claim is distinct from the standard of review applied by the trial court:

> Appellate review of a weight claim *is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence.* Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

*Commonwealth v. Clay*, 64 A.3d 1049, 1054–55 (Pa. 2013) (emphasis in original; citations omitted).

Appellant argues that many of the items recovered from his vehicle are innocuous. The knives, according to Appellant, were used in his family seafood business. Appellant's Brief at 35. Appellant also states that both he and the victim collected guns, knives and ammunition during their marriage. Appellant claims other items, including the camouflaged facemask, arrowheads and orange rubber gloves are consistent with hunting. *Id.* He claims he obtained body armor after he was robbed at gunpoint. *Id.* at 36. He claims his statement to police does not support his conviction because police did not create an audio or video record and because Appellant did not sign the statement. *Id.* Appellant claims there was no evidence he knew of or possessed the firearm found in his vehicle. *Id.* at 36-37. Finally, Appellant argues that he had permission to contact his child, and that this is a domestic relations case rather than a criminal case, and that the victim is at fault for failing to abide by a governing custody and visitation order. *Id.* at 38-40.

The trial court explained its discretionary decision as follows:

> The verdict in this case does not shock one's sense of justice. As summarized above, [Appellant] was secretly following Anne and taking pictures of her, her school, her vehicle, and her family and friend's vehicles; he contacted her via text messages, emails, and phone calls, in violation of an active PFA; he made various threats toward Anne via text messages, emails, and phone calls; he was caught following Anne, in violation of the PFA; he was found in possession of a

- 18 -

firearm for which he did not possess a license, and which was also in violation of the PFA; and he was found in possession of body armor, brass knuckles, and a stun baton. There was overwhelming evidence presented to find [Appellant] guilty of the crimes charged. Although [Appellant] testified and denied all the allegations, the jury was free to believe all, part, or none of his testimony. The jury evidently chose to believe the version of events that proved [Appellant's] guilt, and in doing so, rendered a verdict that was consistent with the weight of the evidence.

Trial Court Opinion, 10/21/15, at 11.

Appellant would have us view various pieces of evidence in isolation. While many of the items retrieved from Appellant's car have lawful uses, Appellant's argument fails to account for the presence of all of these items together in his car while he was surreptitiously following the victim. Viewing the record as a whole, we find no abuse of discretion in the trial court's denial of Appellant's motion for a new trial based on the weight of the evidence.

In summary, we have found no merit to any of Appellant's assertions of error. We therefore affirm the judgment of sentence. We direct that a copy of the trial court's April 11, 2014 opinion be filed along with this memorandum.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/25/2016

## IN THE COURT OF COMMON PLEAS OF LEHIGH COUNTY, PENNSYLVANIA
## CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA   |

vs.   |

FLINT ANDREW STATON,   |

        Defendant   |

No.   671-2013
        681-2013

\* \* \* \* \* \* \* \* \* \*

APPEARANCES:

Robert W. Schopf, Esquire, Assistant District Attorney,
    For the Commonwealth

Carol Marciano, Esquire, Assistant Public Defender,
    For the Defendant

\* \* \* \* \* \* \* \* \* \*

### OPINION

**James T. Anthony, Judge:**

The defendant is charged in the above-captioned cases with firearms not to be carried without a license, persons not to possess a firearm, four counts of stalking, two counts of terroristic threats, three counts of harassment, two counts of possessing an instrument of crime, and two counts of prohibited offensive weapon. On September 9, 2013, the defendant filed an Omnibus Pre-Trial Motion consisting of (1) Petition for Writ of Habeas Corpus and/or Motion to Dismiss charges for Failure to Establish *Prima Facie* Case, (2) Motion to Suppress, (3) Motion to Compel Discovery, and (4) Motion to Allow Additional Pre-Trial Motions. A hearing was held on October 22, 2013 and November 6, 2013. Following the hearing, I took the motions under advisement, and the parties submitted briefs. This opinion follows.

1

## Findings of Fact

Anne Staton and the defendant, Flint Staton, were married in 2002. In October 2010, the couple began having marital issues, and Anne left their home in Perkiomenville[1] and stayed at a women's shelter with her 2 year old daughter, Grace. At the time, Anne was pregnant with their daughter Evelyn. Anne left the shelter after two weeks and went to stay with a friend. Anne eventually returned to the marital home, but problems continued when she confronted the defendant about having an affair. In November of 2011, the couple got into a physical fight in front of the children where the defendant "man-handled" Anne and punched her in the head.[2] Anne again left the home and began staying at her mother's home with the children.[3] At the suggestion of the State Police, Anne sought and received a temporary protection from abuse (PFA) order against the defendant in Montgomery County.

The couple was still apart in December 2011, but spent Christmas day together. Anne planned to have brunch with the defendant and then take the children to her grandfather's house. An argument ensued because the defendant wanted to go along with them, but Anne explained she was just taking the children. The defendant told Anne if he was not going, then nobody was going. At some point, the defendant took Anne's cell phone and car keys away from her. After brunch, Anne took Evelyn upstairs for a nap, and the defendant followed her. Anne got Evelyn to fall asleep, but the defendant would not allow Anne to leave the bedroom. The defendant forced Anne to bend over the bed, twisting her arm up behind her back, and forced her to have sex. The defendant put a pillow over Anne's head to prevent her from screaming. Following

---

[1] Perkiomenville is located in Montgomery County, Pennsylvania.
[2] Notes of Testimony, October 22, 2013, p. 70.
[3] Anne's mother lived in Emmaus, Lehigh County, Pennsylvania.

2

this incident, Anne and the defendant went back downstairs to open presents with Grace. Anne did not attempt to leave because the defendant had her phone and car keys, and she did not want to leave the children with him.

Several hours went by and the defendant's brother, Matt, arrived at the house. Anne told Matt that the defendant would not allow her to leave the house. Matt entered the house and helped Anne get her car keys. Anne took the children, exited the home, and got in her car. The defendant followed and entered the back seat of Anne's car. Anne exited her car and entered Matt's car. Eventually, Anne was able to get back in her car without the defendant. She started to pull away and the defendant punched at her driver's side window, causing it to shatter. Anne went to her grandfather's house and called the police. She was taken to Abington Memorial Hospital to have a rape kit done, and she eventually went to the State Police barracks to give a statement.

In January 2012, Anne was living with her mother in Emmaus. She and Grace were in a second story bedroom watching TV when they observed a cell phone attached to a pole slowly pan across the window. At the time, a temporary PFA order was in effect preventing the defendant from contacting Anne. Around this same time, Anne discovered two flat tires on her car and contacted the police. Officer Alfred Kloss of the Emmaus Police Department was dispatched for the incident and made a report. Kloss was made aware of the PFA, but told Anne that he could not do anything more without a witness as to who slashed her tires.

On February 15, 2012, Anne received an envelope in her mailbox, which contained three Walmart gift cards. The envelope had Anne's name and address written

3

on it, but did not have a stamp on it. Anne recognized the handwriting as the defendant's.

On March 20, 2012, a final PFA order was entered in Montgomery County prohibiting the defendant from any verbal or physical contact with Anne. The defendant was permitted to contact Anne in writing regarding the children only. Despite the PFA, the defendant texted and emailed Anne regarding personal things not related to the children. The text messages continued, and on July 7, 2012, Anne contacted the police again, and Officer Kloss filed a PFA violation against the defendant. Kloss spoke to the defendant on the phone and he agreed to turn himself in. However, the defendant never showed up, and an arrest warrant was issued.

On Halloween 2012, Anne was with the children at her sister's house, and Grace went upstairs to have a phone call with the defendant. Grace came back downstairs quickly, and when Anne asked her what happened, Grace said the defendant had threatened to kill her and put her in a plastic bag. Thereafter, Anne sought a PFA order on behalf of her daughter. A final PFA order for Grace was entered on November 15, 2012, preventing the defendant from contacting Grace and preventing him from possessing any firearms.

Around Thanksgiving of 2012, Anne was taking classes at Northampton Area Community College. One evening, around 8:00 PM, Anne finished a class and went to her vehicle in the parking lot. When she approached her car, she saw an "X" drawn on her driver's side window. It appeared to be written with chapstick. Anne left and was driving on Route 22 when she realized a car had followed her from the school. She proceeded to drive to Boscov's at the Lehigh Valley Mall and park. The same car, a

4

dark sedan, followed her and also parked. She entered the store and began shopping. Within about five minutes, Anne was walking around a display when she saw the defendant come into her view. He immediately turned around and walked quickly away. Anne advised a sales associate that she had a PFA order against a person that just followed her into the store. Security was alerted, and subsequently the police were called. Anne viewed video surveillance and it showed the defendant in the store.

The defendant continued to text and email Anne threatening messages. On several occasions, Anne went to the Emmaus Police Department to inform them of the messages. On January 31, 2013, around 5:30 am, Anne left her apartment to go to work, and she observed a dark sedan with its headlights off following her on Main Street. Anne made several turns until she was perpendicular with Main Street, and she saw the same vehicle driving in the opposite direction on Main Street. The defendant was the driver of the car. Anne called 911 and reported what was happening.

Sergeant Timothy Hoats was working the night shift and received the 911 dispatch at the station. Hoats was advised that a caller was on the phone indicating she was being followed by her estranged husband, against whom she had an active PFA order. Dispatch advised Anne to drive to the police station, so Hoats went outside to wait for her. In the meantime, a patrol officer attempted to intercept the defendant, but was unable to do so. Hoats observed Anne arrive at the station, but no vehicles were following her at that time. Hoats spoke with Anne, and she said the defendant was following her in a green sedan, wearing a baseball cap and glasses. Hoats advised

5

Officer Kloss about the incident. Kloss subsequently contacted the District Attorney's office and filed stalking charges against the defendant on February 1, 2013.[4]

Sergeant Hoats advised Anne to stagger her route to work and to call 911 immediately if she saw the defendant following her again. The next morning, Hoats parked near Anne's apartment at around 4:30 am. From his vantage point, he could see her entranceway and where her car was parked. Hoats observed Anne leave her apartment around 5:10 am and enter her vehicle. She pulled away going east on Main Street and staggered her route as suggested by Hoats. He paralleled her and saw her drive on 6th Street to Chestnut Street. He followed for approximately ¼ to ½ mile, but did not see anyone following her that day.

On the morning of February 4, 2013, Sergeant Hoats again parked his patrol vehicle near Anne's apartment. Around 5:12 am, he observed Anne exit her apartment and eventually saw her vehicle pull out onto Main Street, this time heading west. At that time of day, there was virtually no traffic on the street, but Hoats saw a vehicle follow Anne soon after she left. The vehicle, a dark sedan, passed directly in front of Hoats's vehicle, and the driver was wearing glasses and a baseball hat. Hoats pulled out behind the vehicle and accelerated to catch up with the car. When he caught up, the driver looked in the rearview mirror and made an abrupt right turn onto 3rd street without signaling. Hoats followed and entered the license plate into his mobile computer. The registration came back to the defendant, Flint Staton. Hoats was aware of the outstanding arrest warrant from the PFA violation, so he radioed for another patrol unit.

Officer Bryan Hamscher was parked in the area of State Avenue and Harrison Street and received a call from Sergeant Hoats advising that he was following a car with

---

[4] CP-39-CR-671-2013

6

a possible wanted person and was heading towards Hamscher's location. Hamscher observed the vehicles driving directly towards him, and along with Hoats, he conducted a vehicle stop of the defendant on Harrison Street.

Sergeant Hoats approached the vehicle and spoke with the defendant. The defendant said he was coming from Allentown and was on his way home. Hoats asked the defendant to exit the vehicle and put his hands on the roof. Hoats patted down the defendant and told him there was a warrant out for his arrest. Hoats handcuffed the defendant and placed him in the back of his patrol car. Because the vehicle was not legally parked and was in the lane of traffic, it needed to be towed. Per Emmaus Police Department policy, an inventory search of the vehicle was performed by Officer Hamscher.

Officer Hamscher initially observed some electronic devices inside boxes located on the back seat of the defendant's car. Hamscher started the inventory search and located a wallet, a pocket knife, a folding butterfly knife, and stun baton in the center console. Hamscher then opened the trunk and found a large kitchen knife inside. Based on the various knives found, Hamscher stopped the inventory search. He contacted Hoats, and the police subsequently obtained a search warrant for the vehicle. During the search, police discovered numerous items including, a loaded .40 caliber Walther P990 handgun, gloves, a wig, a camouflage mask, arrows, a Kevlar military helmet, a shoulder holster, a crowbar, a stun gun, duct tape, nylon cable restraints, binoculars, a calendar book belonging to Anne Staton, a Valentine's Day card that read "A Promise for My Wife," a Motorola Razr flip phone, a Cannon digital camera, a Dell laptop, brass

7

knuckles, a handcuff key, OC spray, a large machete with a sheath, various knives, and copies of the PFA orders against the defendant.

The defendant was transported to the police station and placed in a holding cell. At the station, Sergeant Hoats performed a more thorough search of the defendant and discovered he was wearing a bullet proof vest. Additionally, Hoats found a balaclava style ski mask in the defendant's coat pocket and a Samsung cell phone. Officer Kevin Schmidt spoke to the defendant in the holding cell and asked him if he was willing to talk to the police; the defendant agreed. Schmidt read the defendant a Miranda rights and waiver form, and the defendant signed the form.[5] The defendant appeared to understand the form and did not appear to be under the influence. Schmidt interviewed the defendant for almost four hours. The defendant never asked to stop the interview and did not ask for an attorney. A narrative of the interview was prepared by Schmidt and entered into evidence.[6]

Sergeant Hoats secured search warrants for the cell phones, digital camera, and laptop. Some of the photographs recovered depicted Anne's apartment entrance, her license plate, her grandfather's home, doors at Northampton Community College, and Anne and her daughter shopping. Phone records showed various texts messages from the defendant to Anne that were threatening in nature. The Walther P990 handgun was submitted to the Pennsylvania State Police and was deemed functional. Hoats contacted the District Attorney's Office, and along with Officer Schmidt, filed additional charges against the defendant on February 7, 2013.[7]

---

[5] A copy of the form was admitted into evidence as Commonwealth's Exhibit 9.
[6] Commonwealth's Exhibit 10.
[7] CP-39-CR-681-2013

The defendant testified at his pretrial hearing. According to the defendant, the police said they wanted to talk to him, put a piece of paper in front of him, and told him to sign it. The defendant said he did not know what the paper was, and did not read it. He testified that he was never read his Miranda rights. When asked why he spoke to the police, the defendant said he felt threatened and coerced. He testified that Officer Schmidt asked him if he knew anything about dead bodies and asked him personal questions regarding sex with Anne. The defendant said he asked to speak with an attorney three times and told Schmidt more than once that he did not want to answer any more questions. The defendant testified that he felt like he was under the influence of alcohol because he drank the night before. However, he stated he drank five beers and had the last one approximately five hours before he was interviewed. Finally, the defendant said the police fabricated information to put in their reports just so they could secure search warrants.

## Discussion

### I. Petition for Writ of Habeas Corpus

The Court's sole determination during a habeas hearing is to determine whether the Commonwealth has set forth a *prima facie* case with respect to each element of the crimes charged. *Commonwealth v. Miller*, 810 A.2d 178, 180 (Pa.Super.2002). A *prima facie* case consists of evidence, read in the light most favorable to the Commonwealth, that establishes that a crime has been committed and that the defendant is probably the one that committed the crime. *Id.* In other words, the Commonwealth must produce evidence that, if accepted as true, would warrant the case going to a jury. *Commonwealth v. Austin*, 575 A.2d 141, 143 (Pa.Super.1990); *Miller*, 810 A.2d at 180.

9

This does not require the Commonwealth to prove guilt beyond a reasonable doubt nor that evidence is available for trial to prove guilt beyond a reasonable doubt. *Austin*, 575 A.2d at 143.[8]

### a. Prohibited Offensive Weapons

"A person commits a misdemeanor of the first degree if, except as authorized by law, he makes repairs, sells, or otherwise deals in, uses, or possesses any offensive weapon." 18 Pa.C.S.A. § 908(a). An offensive weapon includes metal knuckles. 18 Pa.C.S.A. § 908(c).

Officer Schmidt testified he recovered brass knuckles from the defendant's glove compartment. It is the defendant's contention that the item was meant to be utilized as a belt buckle. I reviewed a photograph of the item, and while it is contained in a box labeled "Heavy Duty Belt Buckle," there is nothing depicted to show how it could be utilized as a belt buckle. To the contrary, the item appears to be exactly what it is alleged to be – metal knuckles – an offensive weapon specifically prohibited by statute. Furthermore, even if I were to find the knuckles could be fashioned into a belt buckle, they would still be prohibited by law. "The statute does not prohibit only items with no Conceivable lawful purpose, but, more broadly, items with no Common lawful purpose." *Commonwealth v. Fisher*, 400 A.2d 1284, 1288 (Pa. 1979). As such, the defendant's allegation is without merit.[9]

---

[8] The defendant initially challenged several counts in case 671-2013 as being duplicative of counts in case 681-2013, but withdrew the claim after the Commonwealth amended the criminal informations, and due to the holding in *Commonwealth v. Leach*, 729 A.2d 608 (Pa.Super. 1999).

[9] The defendant has offered no evidence from which I could find that he possessed the weapons solely as a curio. See 18 Pa.C.S.A. § 908(b)(1).

10

### b. Possessing Instruments of Crime

"A person commits a misdemeanor of the first degree if he possesses any instrument of crime with intent to employ it criminally." 18 Pa.C.S.A. § 907(a). An instrument of crime includes "[a]nything specifically made or specifically adapted for criminal use" or "[a]nything used for criminal purposes and possessed by the actor under circumstances not manifestly appropriate for lawful uses it may have." 18 Pa.C.S.A. § 907(d).

The defendant alleges the possessing instruments of crime (PIC) charge cannot stand pursuant to *Commonwealth v. Williams*, 808 A.2d 213 (Pa.Super. 2002). In *Williams*, the defendant was convicted of PIC when he utilized a walkie-talkie to facilitate a drug sale by directing people into a nearby house. In reversing that conviction, the Superior Court held that the walkie-talkie was not an instrument of crime since it was not used in the crime itself, but rather only facilitated the crime.

The instant case is easily distinguishable from *Williams*. In that case, the defendant used the walkie-talkie as it was meant to be used, and that action did not constitute a crime. Here, however, the defendant adapted the cell phone by attaching it to a pole in order to spy on Anne Staton, which itself was a crime since a PFA was in effect preventing the defendant from having any contact with Anne.[10]

Read in the light most favorable to the Commonwealth, the evidence establishes that a crime was committed and that the defendant was likely the one that committed the crime. As such, the defendant's motion must fail.

---

[10] I also find the circumstances under which the defendant possessed the cell phone were not manifestly appropriate for its lawful use, and thus find the Commonwealth presented prima facie evidence under either definition.

## II. Motion to Suppress

When deciding a motion to suppress, the court is required to make findings of fact and conclusions of law in order to determine whether the challenged evidence was legally obtained. Pa.R.Crim.P. Rule 581(H); *Commonwealth v. Wilmington*, 729 A.2d 1160, 1162 (Pa.Super. 1999). It is the Commonwealth that bears the burden of establishing, by a preponderance of the evidence, that the challenged evidence was not obtained in violation of the defendant's rights. Pa.R.Crim.P. Rule 581(H); *Commonwealth v. Smith*, 784 A.2d 182, 186 (Pa.Super. 2001). Any determinations of witness credibility and what weight should be afforded their testimony are within the exclusive province of the suppression court. *Commonwealth v. Fitzpatrick*, 666 A.2d 323, 325 (Pa.Super. 1995).

### a. Inventory Search

Inventory searches are a well-defined exception to the warrant requirement. *Commonwealth v. Hennigan*, 753 A.2d 245, 254 (Pa.Super. 2000) (citing *Colorado v. Bertine*, 479 U.S. 367, 371 (1987)). The purpose of such searches is not to discover criminal evidence, but rather to safeguard an individual's property while in police custody and to protect the police against claims of lost or stolen property. *Hennigan* 753 A.2d at 255.

> A warrantless inventory search of an automobile is different from a warrantless investigatory search of the same. An inventory search of an automobile is permitted where: (1) the police have lawfully impounded the automobile; and (2) the police have acted in accordance with a reasonable, standard policy of routinely securing and inventorying the contents of the impounded vehicle. [*South Dakota v. Opperman*, 428 U.S. 364, 368-372 (1976)]....
>
> In determining whether a proper inventory search has occurred, the first inquiry is whether the police have lawfully impounded the automobile,

12

*i.e.*, have lawful custody of the automobile. *Opperman,* 428 U.S. at 368, 96 S.Ct. 3092. The authority of the police to impound vehicles derives from the police's reasonable community care-taking functions. *Id.* Such functions include removing disabled or damaged vehicles from the highway, impounding automobiles which violate parking ordinances (thereby jeopardizing public safety and efficient traffic flow), and protecting the community's safety. *Id.* at 368-369, 376 n. 10, 96 S.Ct. 3092.

The second inquiry is whether the police have conducted a reasonable inventory search. *Id.* at 370, 96 S.Ct. 3092. An inventory search is reasonable if it is conducted pursuant to reasonable standard police procedures and in good faith and not for the sole purpose of investigation. *See Bertine,* 479 U.S. at 374, 107 S.Ct. 738.... Said another way, the inventory search must be pursuant to reasonable police procedures, and conducted in good faith and not as a substitute for a warrantless investigatory search.

*Hennigan,* 753 A.2d at 255.

There is no doubt the police had lawful custody of the defendant's vehicle,[11] and it appears the defendant is not specifically challenging that fact. Rather, the defendant claims the police conducted a warrantless investigatory search instead of an inventory search. The defendant's allegation is without merit.

It is the policy of the Emmaus Police Department to conduct vehicle inventories in order "to protect motor vehicles and their contents while in police custody; the agency against claims of lost, stolen or damaged property; and to protect departmental personnel and the public against injury or damaged property due to hazardous materials or substances that may be in the vehicle."[12] There is no evidence that the police searched the vehicle in bad faith or as a substitute for a warrantless investigatory search. *Id.* Officer Hamscher would have been justified in continuing his inventory

---

[11] There was an active arrest warrant for the defendant, and his vehicle was stopped in the lane of traffic and in an area where there was no legal parking.

[12] Emmaus Police Department, Procedure No. 18, Motor Vehicle Inventories. A copy of the policy was admitted into evidence as Commonwealth's Exhibit 3 at the hearing on November 6, 2013. Note: There was another Commonwealth's Exhibit 3 – a copy of a Final PFA of 11/15/12 – entered into evidence at the hearing on October 22, 2013.

13

search, regardless of whether he found possible evidence of a crime. The fact that he stopped his search upon discovering criminal evidence only supports the conclusion that he was acting in good faith in conducting an inventory search. As such, the search of the vehicle was lawful and suppression is not warranted.

### b. Defendant's Statements

When a defendant challenges inculpatory statements given to the police, a totality of the circumstances test is employed to determine the voluntariness of the confession and whether the accused knowingly and intelligently waived his or her rights. *Commonwealth v. Jones*, 683 A.2d 1181, 1189 (Pa. 1996) (citing *Commonwealth v. Edmiston*, 634 A.2d 1078 (Pa. 1993)). Factors to be considered include: the duration and means of interrogation; the defendant's physical and psychological state; the conditions attendant to the detention; the attitude exhibited by the police during the interrogation; and any other factors which affect a person's power to resist suggestion and coercion. *Id*. The defendant contends he gave statements to the police without being advised of his Miranda rights or waiving said rights. I find this allegation to be without merit.

Officer Schmidt credibly testified that he read the defendant a Miranda rights and waiver form, that the defendant agreed to speak with him, and that the defendant signed the form. Schmidt stated the defendant appeared to understand his rights and did not appear to be under the influence. Schmidt also testified that the defendant never asked to stop the interview and did not ask for an attorney. The defendant does not deny he signed the Miranda waiver form, but rather alleges he did not know what the form was, and felt threatened and coerced into signing it. Specifically, the defendant testified

14

Schmidt asked him about dead bodies and about sexual matters involving Anne Staton. The defendant also stated he asked for an attorney multiple times. I find the defendant's testimony incredible.

Aside from the defendant's testimony, there was no evidence that the police acted inappropriately or coerced the defendant into giving statements. Based on a totality of the circumstances, I find the defendant knowingly, intelligently, and voluntarily waived his Miranda rights and spoke with the police. The defendant's motion is without merit.

### c. Search Warrants

In determining whether a search warrant is based on probable cause, a totality of the circumstances approach is utilized. *Commonwealth v. Torres,* 764 A.2d 532 (Pa. 2001) (citing *Illinois v. Gates,* 462 U.S. 213 (1983)). "This determination must be based on facts described within the four corners of the supporting affidavit." *Commonwealth v. Dukeman,* 917 A.2d 338, 341 (Pa.Super. 2007). An affidavit of probable cause does not require a prima facie showing of criminal activity on the part of the occupants of the place to be searched, but rather that "the totality of the circumstances demonstrates 'a fair probability that contraband or evidence of a crime will be found in a particular place.' " *Id.*

In reviewing a search warrant, a suppression court cannot conduct a *de novo* review to determine whether the warrant was supported by probable cause, but rather is limited to determining whether there was a substantial basis for the issuing authority's finding of probable cause. *Commonwealth v. Cramutola,* 676 A.2d 1214 (Pa.Super. 1996). A reviewing court must give great deference to the issuing authority's finding of

15

probable cause, and must view the information in the affidavit in a common-sense, nontechnical manner. *Commonwealth v. Jones*, 988 A.2d 649 (Pa. 2010) (citations omitted).[13]

I find there was a substantial basis for the magistrate's finding of probable cause to issue a search warrant for the defendant's vehicle.[14] The information within the four corners of the affidavit established the following: the defendant made a statement to Officer Schmidt that a handgun may be found in his vehicle; during an inventory search, police discovered several knives and a stun baton; the defendant was wearing body armor when he was taken into custody; the defendant had an active PFA order against him prohibiting him from possessing any firearms;[15] the defendant had previously violated his PFAs; there was an active arrest warrant for the defendant; Anne Staton reported being followed by the defendant; and the defendant was stopped by police after being observed following Anne in his vehicle. Based on a totality of the circumstances, there was a fair probability that contraband or evidence of a crime would be found in the defendant's vehicle.

I also find there was a substantial basis for the magistrate's finding of probable cause to search the Samsung and Motorola cell phones, the Dell laptop, and the Cannon digital camera.[16] The affidavits of probable cause established Anne Staton was

---

[13] For reasons stated previously, I do not find any of the evidence in this case was obtained unlawfully. Therefore, redaction is unnecessary, and I have reviewed the affidavits of probable cause in their entirety.

[14] A copy of the search warrant was admitted into evidence as Commonwealth's Exhibit 11.

[15] The affidavit mistakenly indicates both active PFAs prohibited the defendant from possessing firearms. However, I do not find this misstatement to be deliberate or material. See *Commonwealth v. Baker*, 24 A.3d 1006 (Pa.Super. 2011).

[16] Copies of the search warrants for the cell phones were admitted into evidence as Commonwealth's Exhibits 4 and 5. The affidavits of probable cause were identical except for the descriptions of the phones. A copy of the Cannon digital camera search warrant was admitted into evidence as Commonwealth's exhibit 6 and a copy of the laptop search warrant was admitted into evidence as Commonwealth's Exhibit 7.

16

receiving unwanted text messages from the defendant despite an active PFA order prohibiting him from contacting her; the defendant was caught by police following Anne on her way to work; when the defendant was arrested, he was wearing body armor and was found in possession of a ski mask and a Samsung cell phone; the defendant knew the pass code for the Samsung phone; and during a search of the defendant's vehicle, police recovered restraints systems, OC spray, wigs, knives, incapacitation devices, drawings depicting violence, a Motorola cell phone, a Dell laptop, and a Cannon digital camera. Given all this, and the charges in this case, specifically stalking and harassment, each affidavit demonstrated a fair probability that evidence would be found on the electronic devices recovered from the defendant and his car. As such, the defendant's motion must be denied.

April 11, 2014

James T. Anthony, Judge

17